# In the United States Court of Federal Claims

No. 10-298C
(Filed under seal December 15, 2011)
(Reissued December 21, 2011)[1]

* * * * * * * * * * * * * * * * * * * * * * * *

|  |  |
|---|---|
| **MORI ASSOCIATES, INC.,** | Pre-award bid protest; NIH; NIDDK; cancellation of procurement; jurisdiction based on FAR §§ 1.602-2 & 3.101-1; duty of fair and honest consideration; arbitrary action; permanent and preliminary injunctions; FAR § 7.302(b) and OMB Circular A-76; small business set-asides & Rule of Two, FAR § 19.502-2(b); task orders; statutory interpretation; use of legislative history when text is plain; sunset clause of 41 U.S.C.A. § 4106(f)(3); agency's cost-savings analysis. |
| Plaintiff, | |
| v. | |
| **THE UNITED STATES**, | |
| Defendant. | |

* * * * * * * * * * * * * * * * * * * * * * * *

*Joseph G. Billings*, Miles & Stockbridge P.C., Baltimore, Maryland, for plaintiff.  *Rita J. Piel*, Miles & Stockbridge P.C., Baltimore, Maryland, *Carol L. O'Riordan* and *Pamela J. Bethel*, O'Riordan Bethel Law Firm, LLP, Washington, D.C., of counsel.

*Dawn E. Goodman*, Commercial Litigation Branch, Civil Division, Department of Justice, with whom were *Tony West*, Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Steven J. Gillingham*, Assistant Director, all of Washington, D.C., for defendant.  *William Rayel*, Commercial Litigation Branch, Civil Division, Department of Justice, Washington, D.C. and *Mogbeyi Omatete*, Office of General Counsel, Procurement, Fiscal and Information Law Branch, Department of Health and Human Services, Washington, D.C., of counsel.

## OPINION AND ORDER

WOLSKI, Judge.

This matter originally came before the Court as plaintiff MORI Associates' protest of procurement actions taken by an agency of the United States Department of Health and Human

---

[1]  This opinion was originally issued under seal, with the parties given the opportunity to suggest redactions.  Plaintiff requested that its labor rates be redacted, and these have been replaced in the following manner: "[XX.XX]."  The opinion is released for publication, with some minor, non-substantive corrections.

Services.  Plaintiff was challenging corrective action proposed by the government in response to a series of protests MORI brought before the Government Accountability Office, and challenging actions taken in the course of the procurement --- including prior evaluations, the immediately preceding award determination, and alleged attempts to improperly assist one offeror and injure plaintiff.  While a motion to dismiss the case was pending, the procurement was cancelled, resulting in a supplemental complaint challenging the cancellation.  In the middle of the briefing schedule for dispositive motions concerning the cancellation, the government agency issued a request for quotations seeking to acquire by task order some of the services previously sought in the cancelled procurement.  This led to a second supplemental complaint challenging the government's failure to determine whether the services should be set aside for a small business award, and to a motion for a preliminary injunction.

For the reasons that follow, the Court has determined that it has jurisdiction over the challenge to the cancellation decision, and over the challenge to the government's failure to follow the small business set-aside regulation.  The Court has further determined that the cancellation of the initial procurement was arbitrary, and that plaintiff is entitled to a permanent injunction against that decision and a preliminary injunction preventing the agency from proceeding under the second solicitation.

## I.  BACKGROUND

### A.  The Initial Bid Protest

The United States Department of Health and Human Services ("HHS"), National Institutes of Health ("NIH"), National Institute of Diabetes and Digestive and Kidney Diseases ("NIDDK" or "agency") issued Request for Quotation No. NIH-NIDDK-08-01 ("RFQ" or "IT Services Solicitation") for the procurement of Information Technology ("IT") services on November 9, 2007.  Pl.'s Second Amended Second Supplemental Complaint (July 30, 2011) ("Compl.") ¶¶ 42, 43.  The RFQ was issued as a follow-on procurement to plaintiff's then-existing contract, No. GS-35F-0464K.  Compl. ¶¶ 2, 43.  The RFQ sought quotations from firms holding General Services Administration ("GSA") Federal Supply Schedule ("FSS") IT Schedule 70 contracts, and anticipated the award of a fixed-price/time and materials contract for an initial twelve month period, with five additional option periods of twelve months each.  Compl. ¶ 68.

The agency awarded a contract to Allied Technologies and Consulting, LLC ("ATC") on January 17, 2008, and MORI filed a protest before the Government Accountability Office ("GAO") on January 29, 2008.  Compl. ¶¶ 9-10.  In this GAO protest, plaintiff asserted that ATC committed a material misrepresentation as to the availability and qualification of its proposed personnel; that ATC did not provide sufficient similar contracts for evaluation of past performance; and that ATC's FSS contract did not have all the labor categories required by the RFQ.  *Id.* ¶ 10.  Plaintiff also alleged that the agency misevaluated its technical proposal. *Id.* ¶ 10.  The agency proposed corrective action, and MORI withdrew its protest.  *Id.* ¶¶ 11-12.

Upon a second award to ATC, MORI again filed a protest with the GAO, on December 23, 2008. Plaintiff challenged the award, alleging: 1) the existence of bias and a conflict of interest at the agency; 2) that the agency did not evaluate proposals in conformance with the RFQ's stated evaluation criteria; 3) that the agency failed to engage in meaningful discussions with plaintiff; 4) that ATC did not hold a valid GSA FSS IT Schedule 70 contract at the time of the bid, and that ATC's GSA FSS contracts did not contain the labor categories required by the solicitation; 5) that ATC did not provide sufficient similar contracts necessary to evaluate its past performance; and 6) that the agency misevaluated plaintiff's technical proposal. Compl. ¶¶ 15-16, 132. The bias claim rested, in part, on the allegation that NIDDK's Chief Information Officer, Cyrus Karimian, had engaged in improper efforts to steer the award to ATC, a very small and inexperienced business whose president had been a friend of Mr. Karimian's since the early 1990s. *Id.* ¶¶ 15(a), 50. Plaintiff alleged that the solicitation's requirements were modified to assist ATC, and learned during debriefing that the team performing the second evaluations was composed of personnel working for Mr. Karimian. *Id.* ¶¶ 15(a), 124. Apparently, a contractor with an alleged "longstanding and ongoing relationship with" ATC's proposed subcontractor might have been involved in the evaluation of offers. *Id.* ¶¶ 15(d), 129. On January 9, 2009 the agency began an investigation, to be conducted by the HHS Office of Inspector General ("OIG"), concerning MORI's charges of bias and wrongdoing on the part of Mr. Karimian. *Id.* ¶ 17. After its request that the protest be completely dismissed was denied, *see* Compl. ¶¶ 18-20, on January 22, 2009 the agency proposed corrective action, which included excluding Mr. Karimian from further involvement in the evaluations or award decision for the IT services procurement, and promising that any logistics contractor to be used in evaluating proposals will not be affiliated with MORI or ATC. *Id.* ¶ 21(g)-(h). The GAO then dismissed the second protest. *Id.* ¶ 22.

On August 24, 2009, NIDDK notified MORI of a third contract award to ATC. Compl. ¶ 23. Plaintiff filed a third protest before the GAO on September 2, 2009, expanding on its claims in the second protest with more information to support the allegations of procurement improprieties --- obtained during the course of a civil action MORI brought against ATC in Maryland state court --- and with greater discussion of the deficiencies resulting from ATC's alleged inability to satisfy the FSS labor category requirements in the RFQ. *See id.* ¶¶ 24-26. Concerning the former, it was alleged that Mr. Karimian amended the solicitation to require work in the area of medical informatics at about the same time he had introduced a leading expert in the field to ATC's president, and to replace NIDDK protocols with those used by the Food and Drug Administration ("FDA"), with which ATC's subcontractor had experience. *Id.* ¶¶ 24(a), 55, 58. Plaintiff also alleges that shortly after becoming NIDDK's chief information officer in January 2007, Mr. Karimian told the person who had previously held the position in an acting capacity that he wanted to bring ATC in to do the agency's IT services work, and asked his predecessor to draft a sole source justification. *Id.* ¶¶ 48, 50-51. Mister Karimian is also alleged to have stated that he would not make a contract award to MORI and wanted plaintiff to be kept out of the competition for the IT services contract. *Id.* ¶ 53. Plaintiff also contends that Mr. Karimian supplied ATC with a confidential, proprietary proposal from a contractor he had previously supervised at another federal agency, to assist ATC in drafting its proposal. *Id.* ¶ 56. The GAO dismissed MORI's protest on October 13, 2009, after agency counsel represented that

he would conduct his own investigation of the alleged procurement wrongdoing, in addition to the OIG investigation that was pending.  Compl. ¶¶ 29-31.

After agency counsel did not complete his investigation within the thirty- to ninety-day period that MORI believed was promised, on March 23, 2010 plaintiff filed a fourth protest with the GAO.  *See* Compl. ¶¶ 29(b), 33, 36.  This protest apparently added to the grounds raised in the third protest the allegation that the agency failed to take the corrective action it proposed in connection with the dismissal of that previous protest.  *See id.* ¶ 36.  On April 21, 2010, the agency filed another notice of corrective action and requested that the GAO dismiss the fourth protest.  *Id.* ¶ 38.  The agency asserted that the HHS OIG investigation concluded with no finding of potential criminal or administrative violations by Mr. Karimian or other NIH employees, and at that time stated that the agency's own procurement integrity investigation determined there was no violation.  *See id.* ¶ 38; App. to Def.'s Mot. Dismiss at 7-8.[2]  The agency proposed corrective action related to the other allegations raised in plaintiff's third protest.  Compl. ¶ 38.  This would include cancelling the award to ATC, providing plaintiff and ATC with a discussion of strengths and weaknesses, requiring revised proposals, reconvening the evaluation panel and reevaluating proposals, conducting new discussions, requesting final proposal revisions, and making a new award based on the evaluations of final proposal revisions.  *Id.*; *see* App. to Def.'s Mot. Dismiss at 8.  After MORI objected to dismissal of the GAO protest, it informed the government that it intended to file a bid protest in this court.  On Friday, May 14, 2010, NIDDK terminated the awarded contract to ATC for convenience, informing plaintiff MORI in an email sent at 9:24 that evening.[3]  Compl. ¶¶ 41, 154.

On May 17, 2010, plaintiff filed its bid protest with our court, challenging the agency's actions for lack of a rational basis and violation of statutes and regulations under the standards contained in 5 U.S.C. § 706(2)(A).  Compl. ¶¶ 41, 179, 182, 185, 187, 190, 193.  Count I of the complaint alleged that NIDDK's proposed corrective action lacked a rational basis because it did not remedy the procurement improprieties.  *Id.* ¶¶ 177-78.  Count II alleged that NIDDK violated

---

[2]  The government later took the position, in arguing for the dismissal of plaintiff's bid protest, that "NIDDK has not yet made a final determination regarding whether the[re] was a PIA [(Public Integrity Act)] violation that has impacted the procurement."  Def.'s Mot. Dismiss at 4 n.4; *see also id.* at 4-5; App. to *id.* at 3-4 (Miller Decl., ¶ 8); Def.'s Reply to Pl.'s Resp. to Def.'s Mot. Dismiss at 17 (contending the agency was still "conducting a full PIA investigation as required by 48 C.F.R. §§ 3.104-7, 303.104-7"); Tr. (June 29, 2010) at 52 (government counsel stating that agency had not yet made its determination).

[3]  Plaintiff's counsel and government counsel had previously agreed that plaintiff would file its complaint on Monday, May 17, 2010.  Tr. (June 29, 2010) at 36.  The agency counsel had been outside the country when that discussion had occurred, and plaintiff's counsel was not aware that the contract award would be canceled prior to the filing of the complaint.  *Id.* at 35; *see also* Pl.'s Mot. J. Admin. R. at 35.

provisions of the Competition in Contracting Act ("CICA"), 41 U.S.C. § 253 and 41 U.S.C. § 259(b)(3), and implementing regulations, by arbitrarily and capriciously awarding a contract to ATC --- whose GSA FSS contract did not include labor categories required by the RFQ. Compl. ¶ 181. Count III alleged that NIDDK acted arbitrarily and violated the CICA provision 41 U.S.C. § 253b(a) and its implementing regulation, by rating ATC's past performance as "Good" when ATC had no contracts similar to those required by the IT services solicitation. Compl. ¶ 184. Count IV alleged that the agency treated offerors unequally, in violation of 41 U.S.C. § 253b(a) and the implementing regulation, and acted arbitrarily by improperly downgrading plaintiff's technical proposal. Compl. ¶ 187. Count V alleged, in the alternative, that NIDDK acted arbitrarily and violated 48 C.F.R. § 15.306(d)(3) by failing to provide plaintiff with meaningful discussions regarding its technical proposal's deficiencies and significant weaknesses. Compl. ¶ 189. Count VI alleged that by steering the IT services contract to ATC, "poaching" MORI's staff and shifting work away from its contract, and improperly evaluating the proposals of MORI and ATC, NIDDK acted arbitrarily and capriciously and in bad faith --- in violation of CICA, 41 U.S.C. § 253b(a) and the implementing regulation at 48 C.F.R. § 8.405-2(d); the Procurement Integrity Act ("PIA"), 41 U.S.C. § 423 and the implementing regulations contained in Subpart 3.1 of the Federal Acquisition Regulation ("FAR"); and the Trade Secrets Act, 18 U.S.C. § 1905. Compl. ¶ 192.[4] On June 1, 2010, the government filed a motion to dismiss the case, arguing that the challenge to the proposed corrective action did not allege the violation of a statute or regulation and was not ripe, Def.'s Mot. Dismiss at 7-13; that MORI was not prejudiced by the corrective action and thus had no standing to challenge it, *id.* at 13-14; that MORI had no standing to challenge evaluation errors (Counts II-V) once the award was cancelled, *id.* at 14-17; and that the allegations in Count VI were beyond our court's jurisdiction or failed to state a claim for which relief may be granted. *Id.* at 17-23.

## B. Cancellation of the IT Services Procurement

After oral argument was heard and while the motion to dismiss was pending, on November 29, 2010, NIDDK cancelled the IT services solicitation. Compl. ¶ 155; Admin. R. ("AR") at 1. One month earlier, the director of NIDDK sent a memorandum to the contracting officer for the IT Services Solicitation requesting this cancellation. AR at 3, Memorandum from Dr. Griffin P. Rodgers to Karen D. Miller (October 28, 2010) ("Rodgers Mem."). The agency's director, Dr. Griffin P. Rodgers, recounted that "[i]n light of" a memorandum issued by the President on March 4, 2009, which stressed the need for government functions to be performed efficiently and addressed outsourcing matters, "NIDDK reviewed its balance of insourcing and outsourcing in the information technology area." AR at 3 (Rodgers Mem.). He then claimed that "[a]n analysis of expenditures showed that NIDDK could realize significant savings if it converted contract support positions to Federal employees." *Id.* Doctor Rodgers stated that in 2009 the agency "requested and received additional" Full Time Equivalents ("FTEs") in the IT area, and that because of hiring in 2009 and 2010 it was "projecting that by December 31, 2010,

---

[4] Count VI of the initial complaint was limited to these statutory and regulatory violations, and the standard of 5 U.S.C. § 706(2)(A). *See* Complaint (May 17, 2010) ¶¶ 169-70.

it will have sufficient staff" to perform several categories of IT services.  *Id.*  The agency expected it would still need to obtain services for Help Desk support by contract, however.  *Id.*  The director concluded, "our requirements have substantially changed for contract support in the area of information technology, and the [RFQ] under evaluation will no longer meet the needs of NIDDK."  *Id.*, AR at 4.

In a memorandum dated November 23, 2010, Ms. Miller noted the cancellation request, repeating the hiring projection from Dr. Rodgers's memorandum.  *See* AR at 5, Memorandum from Karen D. Miller to the FILE ("Miller Mem.").  She added, referencing an attached spreadsheet, that "[i]n addition, an analysis of expenditures reveals/projects that NIDDK could realize a minimum savings of $860,988.21 annually [i]f it converted at least 11 of its contract support positions to Federal employees."  *Id.*  The contracting officer concluded the memorandum by accepting the request and cancelling the procurement.  *Id.*

On November 30, 2010, the government filed a motion to dismiss plaintiff's amended complaint, arguing that the protest was now moot.  Def.'s Supp'l Mot. Dismiss.  MORI responded on December 14, 2010, arguing that the Court retained jurisdiction over the case because the NIDDK cancellation decision allegedly violated Office of Management and Budget ("OMB") Circular A-76 ("the Circular") and lacked a rational basis.  Pl.'s Mot. Opp. Def.'s Supp'l Mot. Dismiss at 15.  Plaintiff submitted a supplemental complaint, adding allegations concerning the cancellation of the procurement, which became the subject of a new Count VII (and were added to Count VI).[5]  After a delay to provide the contracting officer additional time to reevaluate the cancellation decision, *see* Order (Jan. 18, 2011), the government filed the administrative record for this decision on February 11, 2011.  This record initially consisted of five documents:  the cancellation posting, the Rodgers and Miller memoranda, the March 4, 2009 Presidential memorandum, and an email from Mr. Karimian with MORI's invoice for March 2009 payment attached.  *See* AR at 1-16.

Plaintiff moved to supplement the administrative record, contending that additional documents or information must have been considered in making the decision.  *See MORI Assocs., Inc. v. United States*, 98 Fed. Cl. 572, 574 (2011).  The government responded with a supplemental administrative record, adding the January 2009 federal employee salary table for the Washington, D.C. area, the job descriptions for six NIDDK positions, the GSA FSS contracts of three contractors (but not MORI's), and three emails with attachments, concerning the numbers of FTEs requested and approved for NIDDK for fiscal years 2010 and 2011.  *See* AR at 17-79; *MORI Assocs.*, 98 Fed. Cl. at 574.  Plaintiff did not oppose the government's proposed

---

[5]  Although plaintiff was given leave to file the supplemental complaint, *see* Scheduling Order (Dec. 22, 2010), MORI instead filed a motion to supplement, with the new complaint attached --- presumably so that it could identify the new portions of the complaint.  *See* Pl.'s Mot. Supp. Compl. & Attach. 1.  Since this motion was not necessary, the Court considers the Supplemental Complaint to have been filed when submitted on December 22, 2010.  *See MORI Assocs., Inc. v. United States*, 98 Fed. Cl. 572, 573 (2011).

supplementation, and sought to have added to the administrative record a page from its final proposal revision.  This page, submitted to the agency as part of the July 29, 2009 proposal, showed the hourly rates MORI was proposing --- at a discount from its GSA FSS rates --- to perform the IT services work during what was to be the first option year period (August 17, 2010 through August 16, 2011).  As this information was part of the file for the IT services procurement and would have been known by the contracting officer, the Court concluded that effective review of the cancellation decision required it to be part of the administrative record of that decision.  *MORI Assocs.*, 98 Fed. Cl. at 575.[6]

Plaintiff then filed a motion for judgment on the administrative record.  In its motion, MORI argued that under 28 U.S.C. § 1491(b)(4), the Court should set aside the cancellation decision as a clear violation of regulations and for lack of a rational basis.  Pl.'s Mot. J. Admin. R. (May 27, 2011) ("Pl.'s Cancel'n Br.") at 20-23.  According to plaintiff, the FAR requires agencies to follow OMB Circular A-76 when determining whether commercial services should be provided by the private sector or instead by the use of government employees.  *Id.* at 21 (citing 48 C.F.R. §§ 7.302(b)(2)-(3), 15.203(b)); *see* Compl. ¶ 161.  The agency did not act in accordance with OMB Circular A-76, MORI alleged, when it failed to conduct a streamlined or standard competition; failed to use MORI's proper rates to determine an estimated contract price; and failed to make a public announcement when ending a public-private competition.  Compl. ¶¶ 162-65, 198.  Plaintiff notes that, had the Circular been followed in calculating the costs of government performance of activities, its Attachment C required use of a fringe benefit rate of 36.25 per cent on federal civilian employee salaries, plus an overhead rate of 12 per cent applied on top of salary and fringe benefit costs.  Pl.'s Cancel'n Br. at 6 (citing Attach. C to OMB Circular A-76, Part B, ¶ 2(f)(1) & ¶ 5).  Furthermore, Attachment C provided that FTE calculations should be based on federal employees working 1,776 productive hours annually.  *Id.* at 6-7 (citing Attach. C to OMB Circular A-76, Part B, ¶ 2(d)).  Plaintiff argues that NIDDK should have followed Attachment C in making any cost comparisons for purposes of an in-sourcing decision.  Pl.'s Cancel'n Br. at 30.

MORI contends that the agency erred in creating the cost comparison spreadsheet attached to the Miller Memorandum.  *See* Compl. ¶ 166; AR at 6 ("Spreadsheet").  This spreadsheet was apparently prepared by Mr. Karimian.  *See* AR at 10.  Plaintiff argues that the calculations overstated MORI's rates, and understated the government's costs.  *See* Pl.'s

---

[6] This proposed pricing page, submitted by MORI as Exhibit 3 to the document filed December 14, 2010 (Document 32-1 at 4), is considered page 80 of the administrative record.  Plaintiff subsequently moved to supplement the administrative record with the cover letter to the final proposal revision and the prices proposed for the procurement's base period.  Pl.'s Mot. Supp. Admin. R. (July 8, 2011).  This motion, apparently unopposed, is GRANTED for the same reasons as the previous motion, s*ee MORI Assocs.*, 98 Fed. Cl. at 575, and these pages (Document 85-1 and 85-2) shall be considered AR 81 through 85.  The cover letter to the final proposal revision indicates that MORI's price proposal did not change from that submitted in 2008.  *See* AR at 84.

Cancel'n Br. at 27-28. Concerning plaintiff's own costs, it contends the record lacks a rational explanation connecting the March 2009 invoice rates to those used in the spreadsheet, and that it was arbitrary for NIDDK to have ignored the lower, discounted rates MORI proposed for the procurement. *See id.* at 14, 24, 27-28; Compl. ¶¶ 167-68. Plaintiff also argues that one mysterious position listed in the spreadsheet, a "KCMS Administrator," was given the highest hourly rate despite there being no known equivalent under the MORI contract. Pl.'s Cancel'n Br. at 29, 36. Concerning the government's estimated costs of performance, MORI argues that the spreadsheet used a twenty-seven percent adjustment to federal salary to arrive at the supposedly fully burdened rate, rather than the higher rates under Attachment C; improperly assumed 1,880 productive hours annually per FTE; and applied the government's lower 2009 salaries instead of 2010 salaries. *Id.* at 27-28, 30-32. When these adjustments are made to the spreadsheet, MORI argues, rather than showing significant savings through insourcing, the result is higher costs for the government when the work is performed by employees at grade GS-13 step 5 or higher. *Id.* at 28-32 & Ex.1. The agency's failure to provide a coherent and reasonable explanation for how it prepared the cost comparison in the spreadsheet and why it used the spreadsheet to support the cancellation, MORI argues, demonstrated the arbitrary and capricious nature of the cancellation. Pl.'s Cancel'n Br. at 24-27. Plaintiff also contends that the administrative record failed to support the agency's claims that the FTEs approved and the hiring projected in the IT area were sufficient to perform the non-Help Desk support work solicited in the cancelled procurement. *Id.* at 11-12, 25.

The government responded with a motion to dismiss the cancellation count of the complaint (Count VII) or, in the alternative, a cross-motion for judgment on the administrative record. Def.'s Mot. Dismiss & Cross-Mot. J. Admin. R. (June 17, 2011) ("Def.'s Cancel'n Br."). Defendant argues that our court lacks jurisdiction over the challenge to the cancellation decision, contending that MORI has not identified any statutes or regulations that were violated by this decision. *Id.* at 6-13. The government also maintains that the cancellation was reasonably and rationally based on the agency's changed needs due to the hiring of additional IT employees, and that the cost spreadsheet was irrelevant and in any event reasonably supported the decision to expand the number of FTEs in the IT area. *Id.* at 17-23.

## C.  Help Desk Solicitation

Four days before filing its cross-motion concerning the cancellation decision, the government filed a status report informing the Court that on June 10, 2011, NIDDK issued RFQ No. 11-105/KDM ("Help Desk Solicitation") to acquire professional IT services for Help Desk support and operation. *See* Def.'s Mot. for Leave to File Status Rpt. (June 13, 2011) & Ex. A.[7] Proposals were due June 24, 2011, and the period of performance was originally set to be from July 15, 2011 to January 14, 2012, with four successive six month options. *Id.*, Ex. A at 1. The

---

[7]  The motion for leave to file this report was unopposed and is accordingly GRANTED. In the motion and status report, the Help Desk solicitation is mistakenly identified as RFQ No. 11-1105/KDM. *See* Def.'s Mot. Dismiss & Opp. to Pl.'s Mot. Prelim. Inj. (July 1, 2011) at 4 n.3.

Help Desk Solicitation was to be competed using the NIH Information Technology Acquisition and Assessment Center ("NITAAC"), among contractors holding a CIO-SP2i indefinite delivery/indefinite quantity ("ID/IQ") contract.  App. to Def.'s Mot. Dismiss & Opp. to Pl.'s Mot. Prelim. Inj. (July 1, 2011) ("Def.'s Help Desk Br.") at 3-5, 11-14; *see also* Compl. ¶ 170. Plaintiff alleges that neither it nor any other small business held a CIO-SP2i contract.  Compl. ¶ 171.

Within four days of receiving notice of the Help Desk Solicitation, plaintiff filed a motion for leave to file a second supplemental complaint and a motion for a preliminary injunction.  *See* Pl.'s Mot. for Leave to Supp. Compl. 2nd Time (June 17, 2011); Pl.'s Br. Supp. Mot. Prelim. Inj. (June 17, 2011) ("Pl.'s Help Desk Br.").[8]  The second supplemental complaint added allegations concerning the Help Desk Solicitation --- which were included in a revised Count VI and were the subject of a new Count VIII.  Plaintiff contends that NIDDK's issuance of the Help Desk Solicitation violated the "Rule of Two" contained in 48 C.F.R. 19.502-2(b).  *See* Compl. ¶¶ 175, 201-04.  Under the Rule of Two, contracting officers are required to "set aside any acquisition over $150,000 for small business participation when there is a reasonable expectation that . . . offers will be obtained from at least two responsible small business concerns" and that the "award will be made at fair market prices."  48 C.F.R. § 19.502-2(b) (2010).  MORI alleges that the Help Desk Solicitation requirements (for one manager and ten support specialists) are "materially the same" as a portion of the cancelled procurement (concerning nine Help Desk positions), for which three small businesses (including plaintiff) had been competing.  Compl. ¶¶ 169, 174.  Since the work is valued at over $150,000, MORI maintains that the Rule of Two requires it be set aside for small businesses.  Compl. ¶¶ 170, 201.  Plaintiff argues that the Rule of Two regulation was clearly violated by the issuance of the Help Desk Solicitation, which it alleges was done arbitrarily, as a pretext and in bad faith.  Pl.'s Help Desk Br. at 21-31.

The government responded with a motion to dismiss the Help Desk count (Count VIII) of plaintiff's second supplemental complaint and an opposition to plaintiff's motion for a preliminary injunction.  *See* Def.'s Help Desk Br. at 1-2.  Defendant contends that the agency's decision to use a task order to obtain the Help Desk services placed the procurement beyond our jurisdiction due to 41 U.S.C. § 4106(f).  *Id*. at 7-10.  It further argues that if the protest is construed as a challenge to a solicitation's terms, plaintiff failed to raise a timely challenge while the NITAAC CIO-SP2i solicitation was open.  *Id.* at 11-13.

After the parties filed several reply papers and the Court held a hearing and oral argument on the various motions, MORI was given leave to amend its second supplemental complaint to support its jurisdictional allegations with several regulations it had cited in its briefs, and the government was given an opportunity to respond with a supplemental brief.  *See* Order (July 27, 2011).  The Court then requested that the parties provide additional briefing on several issues.

---

[8]  Although never formally granted, and perhaps mooted by subsequent events, the motion for leave to file the second supplemental complaint was not opposed.  For housekeeping purposes, the motion is hereby GRANTED.

*See* Order (Sept. 14, 2011).  After receiving and reviewing the supplemental briefs, the Court issued an order granting a permanent injunction against the cancellation of the IT services procurement and a preliminary injunction preventing an award under the Help Desk Solicitation. Order Granting Perm. & Prelim. Injs. (Sept. 28, 2011).  This opinion explains the reasoning behind that order.

## II.  DISCUSSION

### A.  Legal Standards

#### *1.  Bid Protest Jurisdiction*

Bid protests are heard by this Court under the Tucker Act, as amended by the Administrative Dispute Resolution Act of 1996 ("ADRA"), Pub. L. No. 104-320, §§ 12(a)-(b), 110 Stat. 3870, 3874 (1996).  28 U.S.C. § 1491(b)(1) (2006).  The relevant provision states that our court:

> . . . shall have jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement.

28 U.S.C. § 1491(b)(1).  Concerning the last phrase of this provision, "[a] non-frivolous allegation of a statutory or regulatory violation in connection with a procurement or proposed procurement is sufficient to establish jurisdiction."  *Distributed Solutions, Inc. v. United States*, 539 F.3d 1340, 1345 n.1 (Fed. Cir. 2008).

The Federal Circuit has construed the ADRA term "interested party" to have the same definition as under CICA, encompassing "actual or prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by failure to award the contract."  *Am. Fed'n of Gov't Employees, AFL-CIO v. United States*, 258 F.3d 1294, 1302 (Fed. Cir. 2001); *see* 31 U.S.C. § 3551(2).  In the context of a pre-award protest, the requisite interest supporting standing and prejudice is established by alleging "a non-trivial competitive injury which can be redressed by judicial relief."  *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1363 (Fed. Cir. 2009).  Normally when considering a motion to dismiss --- even one based on the lack of subject matter jurisdiction --- a court must accept all well-pleaded facts as true and draw all reasonable inferences in the plaintiff's favor.  *See Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974); *Pixton v. B&B Plastics, Inc.*, 291 F.3d 1324, 1326 (Fed. Cir. 2002); *Englewood Terrace Ltd. P'ship v. United States*, 61 Fed. Cl. 583, 584 (2004).[9]

---

[9]  The exception, not presented here, is when jurisdictional facts are challenged, as the plaintiff must then demonstrate jurisdiction by a preponderance of the evidence.  *See McNutt v. GMAC*,

*2. Judgment on the Administrative Record in a Bid Protest*

The ADRA amendments to the Tucker Act require our court to follow Administrative Procedure Act ("APA") standards of review in bid protests.  28 U.S.C. § 1491(b)(4).  Those standards, incorporated by reference, provide that a:

> reviewing court shall . . . (2) hold unlawful and set aside agency action, findings, and conclusions found to be -- [¶] (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; [¶] (B) contrary to constitutional right, power, privilege, or immunity; [¶] (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [¶] (D) without observance of procedure required by law; [¶] (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or [¶] (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.
> In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

5 U.S.C. § 706 (2006).

Based on an apparent misreading of the legislative history, *see Gulf Group, Inc. v. United States*, 61 Fed. Cl. 338, 350 n.25 (2004), the Supreme Court had determined, before the 1996 enactment of the ADRA, that the de novo review standard of 5 U.S.C. § 706(2)(F) does not usually apply in review of informal agency decisions --- decisions, that is, such as procurement awards.  *See Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971) ("*Overton Park*").  Instead, courts in those cases are supposed to apply the standard of 5 U.S.C. § 706(2)(A): whether the agency's acts were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  *See Overton Park*, 401 U.S. at 416 (citation omitted); *see also Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1057 (Fed. Cir. 2000) (applying 5 U.S.C. § 706(2)(A)).  *But see Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 n.5 (Fed. Cir. 2001) ("*Domenico Garufi*") (also citing 5 U.S.C. § 706(2)(D) as applicable in bid protests).  The "focal point for judicial review" is usually "the administrative record already in existence," *Camp v. Pitts*, 411 U.S. 138, 142 (1973), even

---

298 U.S. 178, 189 (1936); *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988).  In examining jurisdictional facts, a court may consider all relevant evidence, including material outside the pleadings.  *See Land v. Dollar*, 330 U.S. 731, 735 & n.4 (1947); *KVOS, Inc. v. AP*, 299 U.S. 269, 278 (1936); *Moyer v. United States*, 190 F.3d 1314, 1318 (Fed. Cir. 1999); *Indium Corp. of Am. v. Semi-Alloys, Inc.*, 781 F.2d 879, 884 (Fed. Cir. 1985); *Forest Glen Props., LLC v. United States*, 79 Fed. Cl. 669, 676-78 (2007); *Patton v. United States*, 64 Fed. Cl. 768, 773 (2005).

when, as here, the matter under review was not the product of a formal hearing. *See Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985); *Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1379 (Fed. Cir. 2009). As noted above, however, supplementation of the record was found necessary for effective judicial review of the cancellation decision. *See MORI Assocs.*, 98 Fed. Cl. at 575.

A motion for judgment on the administrative record under Rule 52.1 of the Rules of the United States Court of Federal Claims ("RCFC") differs from motions for summary judgment under RCFC 56, as the existence of genuine issues of material fact does not preclude judgment on the administrative record. *See Bannum, Inc. v. United States*, 404 F.3d 1346, 1355-57 (Fed. Cir. 2005); *Fort Carson Supp. Servs. v. United States*, 71 Fed. Cl. 571, 585 (2006). Rather, a motion for judgment on the administrative record examines whether the administrative body, given all the disputed and undisputed facts appearing in the record, acted in a manner that complied with the legal standards governing the decision under review. *See Fort Carson*, 71 Fed. Cl. at 585; *Greene v. United States*, 65 Fed. Cl. 375, 382 (2005); *Arch Chems., Inc. v. United States*, 64 Fed. Cl. 380, 388 (2005). Factual findings are based on the evidence in the record, "as if [the Court] were conducting a trial on the record." *Bannum*, 404 F.3d at 1357; *see also Carahsoft Tech. Corp. v. United States*, 86 Fed. Cl. 325, 337 (2009); *Gulf Group*, 61 Fed. Cl. at 350.

Under the "arbitrary and capricious" standard, the Court considers "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment" by the agency. *Overton Park*, 401 U.S. at 416. Although "searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency." *Id.* The Court will instead look to see if an agency has "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action," *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983), and "may not supply a reasoned basis for the agency's action that the agency itself has not given." *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 285-86 (1974). The Court must determine whether "the procurement official's decision lacked a rational basis," *Domenico Garufi*, 238 F.3d at 1332 (adopting APA standards developed by the D.C. Circuit); *see also Delta Data Sys. Corp. v. Webster*, 744 F.2d 197, 204 (D.C. Cir. 1984). A second ground for setting aside a procurement decision is when the protester can show that "the procurement procedure involved a violation of regulation or procedure." *Domenico Garufi*, 238 F.3d at 1332. This showing must be of a "clear and prejudicial violation of applicable statutes or regulations." *Id.* at 1333 (quoting *Kentron Haw., Ltd. v. Warner*, 480 F.2d 1166, 1169 (D.C. Cir. 1973)).

Under the first, rational basis ground, the applicable test is "whether 'the contracting agency provided a coherent and reasonable explanation of its exercise of discretion.'" *Domenico Garufi*, 238 F.3d at 1333 (quoting *Latecoere Int'l, Inc. v. United States Dep't of Navy*, 19 F.3d 1342, 1356 (11th Cir. 1994)). This entails determining whether the agency "'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency,'" or made a decision that was "'so implausible that it

could not be ascribed to a difference in view or the product of agency expertise.'" *Ala. Aircraft Indus., Inc.-Birmingham v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43).

Because of the deference courts give to discretionary procurement decisions, "the 'disappointed bidder bears a heavy burden of showing that the [procurement] decision had no rational basis.'" *Domenico Garufi*, 238 F.3d at 1333 (quoting *Saratoga Dev. Corp. v. United States*, 21 F.3d 445, 456 (D.C. Cir. 1994)). "The presence (by the government) or absence (by the protester) of any rational basis for the agency decision must be demonstrated by a preponderance of the evidence." *Gulf Group*, 61 Fed. Cl. at 351; *see Overstreet Elec. Co. v. United States*, 59 Fed. Cl. 99, 117 (2003); *Info. Tech. & Appl'ns Corp. v. United States*, 51 Fed. Cl. 340, 346 (2001) (citing *GraphicData, LLC v. United States*, 37 Fed. Cl. 771, 779 (1997)), *aff'd*, 316 F.3d 1312 (Fed. Cir. 2003). If arbitrary action is found as a matter of law, the Court will then decide the factual question of whether the action was prejudicial to the bid protester. *See Bannum*, 404 F.3d at 1351-54.

### 3.  Injunctive Relief

In a bid protest, our court has the power to issue a preliminary injunction pursuant to 28 U.S.C. § 1491(b)(2) and RCFC 65. A four-factored standard is applied in determining whether to grant a motion for a preliminary injunction, under which a plaintiff must show: 1) that it will suffer irreparable injury if the procurement is not enjoined; 2) a reasonable likelihood of success on the merits of its claim; 3) that the harm suffered by it, if the procurement action is not enjoined, will outweigh the harm to the government and third parties; and 4) that granting injunctive relief serves the public interest. *FMC Corp. v. United States*, 3 F.3d 424, 427 (Fed. Cir. 1993); *Chrysler Motors Corp. v. Auto Body Panels, Inc.*, 908 F.2d 951, 952 (Fed. Cir. 1990); *Zenith Radio Corp. v. United States*, 710 F.2d 806, 809 (Fed. Cir. 1983); *Univ. Research Co. v. United States*, 65 Fed. Cl. 500, 504 (2005). None of the four factors, standing alone, is dispositive; thus, "the weakness of the showing regarding one factor may be overborne by the strength of the others." *Chrysler Motors*, 908 F.3d at 953; *FMC Corp.*, 3 F.3d at 427. Conversely, the lack of an "adequate showing with regard to any one factor may be sufficient, given the weight or lack of it assigned the other factors," to deny the injunction. *Chrysler Motors*, 908 F.3d at 953. The standard for a permanent injunction is the same as that for a preliminary injunction, except that the plaintiff must have *actual* success on the merits to qualify for this relief. *See PGBA, LLC v. United States*, 389 F.3d 1219, 1229 (Fed. Cir. 2004); *Arch Chems.*, 64 Fed. Cl. at 389.

## B.  Jurisdiction

### 1.  Cancellation of the Solicitation

MORI contends that our court has jurisdiction over its challenge to the cancellation of the IT services procurement, under the "alleged violation of statute or regulation in connection with a

procurement" prong of 28 U.S.C. § 1491(b)(1).  Its complaint cites section 1491(b)(1) as the basis for our jurisdiction, as well as pre-ADRA case law concerning our "jurisdiction to review the propriety of a cancellation of a solicitation."[10]  Compl. ¶ 6 (citing *Parcel 49C Ltd. P'ship v. United States*, 31 F.3d 1147, 1151 (Fed. Cir. 1994) and *Northpoint Plaza Ltd. P'ship v. United States*, 34 Fed. Cl. 105, 110 (1995)).  In Count VI, plaintiff contends that several of the government's actions, including the cancellation of the IT services procurement, were taken in bad faith to intentionally injure it, and alleges violations of FAR sections 8.405-2(d), 1.102(b)(3), 1.102-2(c)(3) and 3.101-1.  Compl. ¶ 192.[11]  Count VII alleges that the cancellation was an arbitrary and capricious action taken to avoid litigation of the underlying protest, with a grossly erroneous and improper cost savings calculation violating OMB Circular A-76 and the following FAR provisions:  48 C.F.R. § 1.602-2(b); 48 C.F.R. § 5.205(e); 48 C.F.R. § 7.302(b)(2)-(3); 48 C.F.R. § 8.404(d); 48 C.F.R. § 8.405-2(d); 48 C.F.R. § 8.405-4; and 48 C.F.R. § 15.203(b).  Compl. ¶¶ 195-98.

Plaintiff argues that our court's jurisdiction over challenges to procurement cancellations was well-established prior to enactment of the ADRA and thus, under the Federal Circuit's decision in *Resource Conservation Group, LLC v. United States*, 597 F.3d 1238 (Fed. Cir. 2010), continues to exist under the ADRA.  *See* Pl.'s Cancel'n Br. at 15-16; Pl.'s Resp. Gov't Cross Mot. (July 8, 2011) ("Pl.'s Cancel'n Reply") at 2-3.  MORI contends that several FAR provisions promise fair treatment of offerors, and can be violated by the improper cancellation of a procurement.  These include the statement that the government's procurement system will "[c]onduct business with integrity, fairness, and openness," 48 C.F.R. §1.102(b)(3) (2010), which is buttressed by the performance standard that "[a]ll contractors and prospective contractors shall be treated fairly and impartially but need not be treated the same."  48 C.F.R. §1.102-2(c)(3) (2010).  *See* Pl.'s Cancel'n Br. at 16-17.  MORI also cites the standard of conduct required by FAR section 3.101-1, *see* Pl.'s Cancel'n Br. at 2, 15, 20; Pl.'s Cancel'n Reply at 5-7, which mandates that government business be conducted, "except as authorized by statute or regulation, with complete impartiality and with preferential treatment for none."  48 C.F.R. § 3.101-1 (2010).  And plaintiff also bases jurisdiction on FAR section 1.602-2(b), which requires that contracting officers "[e]nsure that contractors receive impartial, fair, and equitable treatment."  48 C.F.R. § 1.602-2(b) (2010); *see* Pl.'s Cancel'n Reply at 7-8 & n.4.  MORI contends that these regulations serve as a "codification of the fundamental principle of government contracts that the government[] treat contractors equally and fairly, including an implied contract of fair dealing."  Pl.'s Cancel'n Reply at 7.

Although FAR section 15.305(b) is not mentioned in the complaint, plaintiff also discusses this provision in the course of its jurisdictional argument.  *See* Pl.'s Cancel'n Br. at 16-

---

[10]  In textual sentences in this opinion, the word "section" is used generically to refer to codified statutory or regulatory provisions, even when the relevant portion is contained in a subdivision.

[11]  Other regulations and three statutes are also identified, but these appear to relate to the other government actions embraced by that count.  *See* Compl. ¶ 192.

17, 20; Pl.'s Cancel'n Reply at 2-3.   MORI seems, however, to be merely arguing that this provision, which does not apply to Federal Supply Schedules procurements, *see* 48 C.F.R. § 8.404(a), has analogues among the FSS provisions.   *See* Pl.'s Cancel'n Reply at 4-5; Pl.'s Response to Ct.'s Order (September 21, 2011) ("Pl.'s Supp'l Br.") at 10-12.   Alleged violations of section 15.305(b), which allows the Source Selection Authority to "reject all proposals received in response to a solicitation, if doing so is in the best interest of the Government," 48 C.F.R. § 15.305(b) (2010), have been found to be the basis for our court's jurisdiction over protests of the cancellation of negotiated procurements under FAR Part 15.   *See Def. Tech., Inc. v. United States*, 99 Fed. Cl. 103, 114-15 (2011); *Madison Servs., Inc. v. United States*, 92 Fed. Cl. 120, 126 (2010); *DCMS-ISA, Inc. v. United States*, 84 Fed. Cl. 501, 510-11 & n.20 (2008). Plaintiff maintains that language in provisions of FAR Subpart 8.4, concerning best value determinations and price negotiations in FSS procurements, can be read as limiting cancellation decisions.   Pl.'s Cancel'n Reply at 4 (discussing 48 C.F.R. §§ 8.404(d), 8.405-2(d), and 8.405-4).

MORI further alleges the violation of two other FAR provisions, which it argues must be reviewed under the "clear and prejudicial violation" test, *see Domenico Garufi*, 238 F.3d at 1333, rather than the rational basis test, *see id.* at 1332, applicable to the other alleged violations.   *See* Plaintiff's Cancel'n Br. at 17, 20-22; Pl.'s Supp'l Br. at 12.   The first provision, FAR section 15.203(b), allows an RFP to be issued for OMB Circular A-76 cost comparison studies.   48 C.F.R. § 15.203(b).[12]   The second, FAR section 7.302(b), requires agencies to "[c]onduct public-private competitions in accordance with the provisions of the Circular and, as applicable, these regulations," 48 C.F.R. § 7.302(b)(2) (2010), and to "[g]ive appropriate consideration relative to cost when making performance decisions between agency and contractor performance" in such competitions.   48 C.F.R. § 7.302(b)(3) (2010).

The government moves, under RCFC 12(b)(1), for the dismissal of Count VII for lack of jurisdiction.[13]   In the government's view, since the cancelled solicitation was a GSA FSS procurement, pursuant to 48 C.F.R. § 8.404(a) none of the provisions of FAR Part 15 --- including sections 15.203(b) and 15.305(b) --- applies to the procurement.   Def.'s Mot. Dismiss & Cross-Mot. J. Admin. R. (June 17, 2011) ("Def.'s Cancel'n Br.") at 8.   Defendant also argues that FAR sections 8.404(d), 8.405-2(d), and 8.405-4 are not relevant to the cancellation of a

---

[12]   The term "studies" is used to refer to these competitions, apparently reflecting the terminology of the superseded and rescinded OMB Circular A-76 Revised Supplemental Handbook.

[13]   Although the government had not expressly moved to dismiss Count VI, which includes the cancellation of the IT services procurement among the challenged actions, *see* Compl. ¶ 192, the Court will construe defendant's motion to dismiss as encompassing the cancellation portion of Count VI --- as the government argues that the regulations associated with that portion cannot be the basis for our jurisdiction.   *See* Def.'s Cancel'n Br. at 8-11 (addressing 48 C.F.R. §§ 1.102(b)(3), 1.102-2(c)(3) & 3.101-1); Def.'s Cancel'n Reply at 4-5 (addressing 48 C.F.R. § 8.405-2(d)); Def.'s Supp'l Br. I at 2-3 (same).

solicitation.  Def.'s Supp'l Br. (August 5, 2011) ("Def.'s Supp'l Br. I") at 2-3; Def.'s Reply to
Pl.'s Resp. to Def.'s Mot. Dismiss (July 22, 2011) ("Def.'s Cancel'n Reply") at 4-5.

The government further contends that FAR sections 1.102(b)(3), 1.102-2(c)(3), and
3.101-1 "do not set forth any independent, mandatory requirements" and "do not create an
enforceable right."  Def.'s Cancel'n Br. at 8-9.  Defendant wants the Court to follow the
reasoning of *Information Sciences Corp. v. United States*, 85 Fed. Cl. 195, 201-02 (2008), which
found that sections 1.102(b)(3) and 1.102-2(c) did not impose judicially enforceable obligations,
rather than that of *FFTF Restoration Co. v. United States*, 86 Fed. Cl. 226, 237-38 (2009), which
held that violations of those provisions trigger our bid protest jurisdiction.  Def.'s Cancel'n Br. at
11.  The government also disputes the contention that alleged violations of FAR section 1.602-
2(b) can be the basis for our court's jurisdiction over a protest of a decision to cancel a
solicitation --- arguing that the provision concerns general responsibilities of contracting officers
rather than enforceable requirements, and distinguishing the cases relied upon by MORI as
involving either the implied contract to fairly and honestly consider bids or the challenge to
proposal evaluations.  Def.'s Supp'l Br. I at 4-6.

Regarding FAR section 7.302(b), the government argues that this provision "essentially
incorporates OMB Circular A-76 into the FAR."  Def.'s Cancel'n Br. at 11.  Since the Circular
states that noncompliance "shall not be interpreted to create a substantive or procedural basis to
challenge agency action or inaction, except as stated in Attachments A and B," OMB Circular
A-76, ¶ 5(g), defendant argues that MORI is limited to whatever challenges those two
attachments would allow.  Def.'s Cancel'n Br. at 11.  The government notes that Attachment A,
concerning the categorizing of positions as commercial or inherently governmental, has nothing
to do with MORI's challenge to the cancellation, *id.* at 11-12; and that Attachment B, concerning
public-private competitions, provides for protests of actions relating only to "standard
competitions," and limits these to agency protests under FAR section 33.103.  *Id.* at 12 (citing
OMB Circular A-76, Attach. B, Part F, ¶ 1).  Since no standard (or, indeed, any) competition was
conducted, the government argues that no review is allowed under the Circular, *id.*, and, thus, no
review may occur under FAR section 7.302(b) --- which it contends "incorporates OMB Circular
A-76 in its entirety," including the limit on review.  Def.'s Cancel'n Reply at 6.  The government
acknowledges that a contractor may base a bid protest on OMB Circular A-76 when a solicitation
expressly incorporates the Circular's cost calculation provisions.  *See* Def.'s Cancel'n Br. at 13;
Def.'s Supp'l Br. I at 7-8 & n.5.  But absent this, defendant contends that plaintiff would fail the
"zone of interests" test for prudential standing, arguing that OMB Circular A-76 was not
intended to benefit contractors.  Def.'s Cancel'n Reply at 6-8.  Though the agency did not
conduct an OMB Circular A-76 competition prior to deciding to hire additional employees to in-
source the IT services work, the government argues that this decision is non-justiciable.  Def.'s
Cancel'n Br. at 22.

### a.  Fair and honest consideration of offers.

After careful reflection, the Court concludes that MORI's protest of the cancellation decision comes within our jurisdiction.  As plaintiff correctly notes, *see* Pl.'s Cancel'n Br. at 15-16, prior to the passage of the ADRA it was settled law that our court had jurisdiction over bid protests seeking to enjoin the arbitrary cancellation of solicitations, as an alleged breach of the implied contract to fairly and honestly consider bids.  *See Parcel 49C Ltd. P'ship v. United States*, 31 F.3d 1147, 1152-54 (Fed. Cir. 1994).  A claim that the implied contract was breached could rest on allegations of arbitrary and capricious actions, and did not require a violation of statute or regulation.  *Keco Indus., Inc. v. United States*, 192 Ct. Cl. 773, 783-84 (1970).  Thus, challenges to the cancellation of a solicitation could rest on *either* a lack of a rational basis for cancellation *or* the violation of applicable statutes and regulations (which were considered incorporated as terms of the implied contract, *see Nat'l Forge Co. v. United States*, 7 Cl. Ct. 530, 532 (1985) (Kozinski, C.J.), *aff'd* 779 F.2d 665, 667 (Fed. Cir. 1985)).  *See Aviation Enters., Inc. v. United States*, 8 Cl. Ct. 1, 15 (1985) (explaining that to establish improper cancellation, a plaintiff "must present evidence of a clear and prejudicial violation of applicable statutes or regulations" when it "is unable to make the . . . showing" that the decision "lacked a rational or reasonable basis" (internal quotations and citations omitted)).

Because of the implied contract to fairly and honestly consider bids, even when an agency adopted regulations purporting to give itself unlimited discretion to cancel solicitations, these decisions were still subject to challenge for arbitrariness.  *See Prineville Sawmill Co. v. United States*, 859 F.2d 905, 909-11 (Fed. Cir. 1988).[14]  On the other hand, regulations --- such as those pertaining to cancellations when sealed bids have already been opened --- may limit procurement officials' discretion even more, requiring a higher standard to be met.  *See R.R. Donnelley & Sons, Co. v. United States*, 38 Fed. Cl. 518, 523 (1997) (applying the less discretionary "compelling reason" standard of a Government Printing Office regulation); *Arrowhead Metals, Ltd. v. United States*, 8 Cl. Ct. 703, 713-14 (1985) (applying the higher "compelling reason" standard of 48 C.F.R. § 14.404-1(a)(1)).  But in the absence of any specific limitation on cancellation of a solicitation, a cancellation was subject to the "constraints . . . applicable to all agency action: that it be free from arbitrariness, capriciousness and abuse of discretion."  *Coastal Corp. v. United States*, 6 Cl. Ct. 337, 344 (1984) (Kozinski, C.J.); *see also Western Pioneer, Inc. v. United States*, 8 Cl. Ct. 291, 299 (1985).

Thus, it was a well-established background principle of procurement law, by the time the Congress passed the ADRA, that solicitations could not be arbitrarily cancelled.  This principle

---

[14]  The *Prineville Sawmill* decision concerned timber sales under a statutory mandate to "insure open and fair competition," 859 F.2d at 909 (citing 16 U.S.C. § 472a(e)(1)(A)), which the Court finds indistinguishable from the Competition in Contracting Act's requirement of "full and open competition."  *See* 41 U.S.C. § 253(a)(1)(A) (2006); *cf.* 41 U.S.C. § 259(b)(3)(A) (2006) (defining "competitive procedures" in the FSS program as requiring participation "open to all responsible sources").

rested not on some specific regulation restricting the actions of government agencies, but on the implied contract to fairly and honestly consider bids that are solicited.  As the Federal Circuit determined in *Resource Conservation Group*, the ADRA expanded our jurisdiction, "ultimately giving the court exclusive jurisdiction to review 'the full range of procurement protest cases previously subject to review in the federal district courts and the Court of Federal Claims.'" 597 F.3d at 1243 (quoting from H.R. Rep. No. 104-841, at 10 (1996)).  This full range included challenges to the arbitrary cancellation of solicitations, and "it seems quite unlikely that Congress would intend [the ADRA] to deny a pre-existing remedy without providing a remedy under the new statute." *Id.* at 1246.  Accordingly, when Congress combined the district courts' APA jurisdiction and remedies in the bid protest realm with our jurisdiction previously exercised under the implied contract theory, it intended that the language of the ADRA would fully embrace this "full range," and not contract our jurisdiction.  Moreover, "Congress may be presumed to be aware of" a long-understood construction of a statute concerning our court's jurisdiction.  *Doe v. United States*, 100 F.3d 1576, 1581 (Fed. Cir. 1996).

Since Congress intended to preserve our pre-existing bid protest jurisdiction, which included challenges to allegedly arbitrary solicitation cancellations, it is reasonable to assume that Congress believed the language of the ADRA would accomplish this purpose.  But the protest of a cancellation of a solicitation is not an "objecti[on] to a solicitation . . . for bids or proposals for a proposed contract or to a proposed award or the award of a contract." 28 U.S.C. § 1491(b)(1).  Therefore, the phrase "or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement," *id.*, must be the vehicle by which the remainder of our pre-existing jurisdiction over procurement protests was preserved.  Consistent with this approach to the ADRA, some of our opinions have identified FAR section 15.305(b) as a regulation that would be violated were there an arbitrary cancellation of a negotiated procurement under FAR Part 15.  *See Def. Tech.*, 99 Fed. Cl. at 114-15; *Madison Servs.*, 92 Fed. Cl. at 126 n.3; *DCMS-ISA,* 84 Fed. Cl. at 510-11 & n.20; *FFTF*, 86 Fed. Cl. at 237 n.15.  This provision does not apply to FSS procurements such as the IT services procurement cancelled by NIDDK.  *See* 48 C.F.R. § 8.404(a).  The Court is not persuaded that the provisions plaintiff cites from the FSS subpart of the FAR --- requiring price reasonableness and best value determinations before FSS orders are placed, and authorizing agencies to seek price reductions from the schedule, *see* Pl.'s Cancel'n Reply at 4-5 (discussing 48 C.F.R. §§ 8.404(d), 8.405-2(d), 8.405-4) --- have the same (or any) relationship to the cancellation of a solicitation as does the provision authorizing an SSA to "reject all proposals received in response to a solicitation." 48 C.F.R. § 15.305(b).[15]  But in any event, as was recounted above, our court's jurisdiction over challenges to solicitation cancellations was not based on the violation of a regulation specifically addressing cancellation, but rather on the implied contract to fairly and honestly consider bids. *See Western Pioneer*, 8 Cl. Ct. at 298-99.  Thus, instead of a regulation relating to cancellation,

---

[15]  The Court notes that a statute provides:  "All sealed bids or competitive proposals received in response to a solicitation may be rejected if the agency head determines that such action is in the public interest." 41 U.S.C. § 253b(b) (2006).  This provision was not cited by the parties, so the Court takes no position on whether it would apply to FSS procurements.

-18-

one should look for a regulation codifying the duty to fairly consider bids, as the repository of the remainder of our bid protest jurisdiction.

The Court holds that the FAR section 1.602-2(b) requirement that contracting officers shall "[e]nsure that contractors receive impartial, fair and equitable treatment" is, among other things, the codification of the government's duty, previously implicit, to fairly and honestly consider bids. Unlike FAR sections 1.102 or 1.102-2, *see Info. Sciences Corp.*, 85 Fed. Cl. at 202, this provision did not begin as some prefatory vision statement, but rather was an original provision of the FAR detailing the responsibilities of contracting officers. *See* 48 Fed. Reg. 42106-07 (Sept. 19, 1983). This provision has not been treated by courts as an unenforceable, non-substantive guideline. Indeed, the Federal Circuit considered an alleged violation of the provision as a ground for a bid protest, *see R & W Flammann GmbH v. United States*, 339 F.3d 1320, 1324 (Fed. Cir. 2003) (holding that in the context of information disclosure, a statutory authority "super[s]eded" the "regulatory requirements found within 48 C.F.R. [§] 1.602-2"), and has recognized FAR section 1.602-2 as a source of the contracting officer's authority. *NKF Engr'g, Inc. v. United States*, 805 F.2d 372, 377 (Fed. Cir. 1986). As MORI notes, numerous opinions of our court have treated FAR section 1.602-2(b) as a binding requirement the violation of which may be reviewed in a bid protest, *see* Pl.'s Cancel'n Reply at 7-8 & n.4, and the Court is not aware of any opinions to the contrary.

The government attempts to distinguish these cases, arguing that the two which directly considered whether FAR section 1.602-2(b) was violated concerned challenges to proposal evaluations, not solicitation cancellations. *See* Def.'s Supp'l Br. I at 6 (discussing *Chenega Mgmt., LLC v. United States*, 96 Fed. Cl. 556, 585-87 (2010) and *Hamilton Sundstrand Power Sys. v. United States*, 75 Fed. Cl. 512, 516 (2007)). Defendant appears to be contending that once our court has jurisdiction over a bid protest because a contract award is objected to, FAR provisions which an agency otherwise need not follow become binding requirements. The Court finds, to the contrary, that if a regulation imposes binding requirements on procurement officials, then allegations of its violation may be the basis for invoking our jurisdiction under the ADRA. *See* 28 U.S.C. § 1491(b)(1).[16] The government also contends that several of our cases seem to link this provision to the implied contract to fairly and honestly consider proposals. Def.'s Supp'l Br. I at 5-6 (citing *PlanetSpace, Inc. v. United States*, 92 Fed. Cl. 520, 536 (2010); *Carahsoft*, 86 Fed. Cl. at 345; and *OSG Prod. Tankers, LLC v. United States*, 82 Fed. Cl. 570, 575 (2008)); *see also Chenega Mgmt., LLC v. United States*, 96 Fed. Cl. 556, 585 (2010); *Precision Images, LLC v. United States*, 79 Fed. Cl. 598, 619 (2007); *HWA, Inc. v. United States*,

---

[16]   Among other things, FAR subsection 1.602-2(b) has been characterized as "the agency's fundamental duty," *Serco Inc. v. United States*, 81 Fed. Cl. 463, 482 (2008); an "affirmative duty," *Precision Images, LLC v. United States*, 79 Fed. Cl. 598, 619 (2007); "impos[ing] certain responsibilities on the contracting officer in the performance of her duties that we cannot ignore," and an "express . . . obligation to treat all offerors equitably." *Hamilton Sundstrand*, 75 Fed. Cl. at 516.

78 Fed. Cl. 685, 697 (2007); *Hamilton Sundstrand Power Sys. v. United States*, 75 Fed. Cl. 512, 516 (2007).  But this reinforces the Court's conclusion that FAR section 1.602-2(b) is the place where the formerly implied contract now expressly resides.  The Court concludes that this provision is violated by government actions which would have breached the implied duty to fairly and honestly consider bids, and thus such actions --- including arbitrary cancellations of solicitations --- would be the "violation of . . . regulation in connection with a procurement."  28 U.S.C. § 1491(b)(1).[17]

The Court notes that FAR section 1.602-2(b) was not cited as supporting Count VI of the complaint, and thus the claim that the IT Services Solicitation was cancelled in bad faith would require another jurisdictional basis.[18]  The Court finds adequate for these purposes the allegation that FAR section 3.101-1 was violated.  This provision reads, in relevant part:  "Government business shall be conducted in a manner above reproach and, except as authorized by statute or regulation, with complete impartiality and with preferential treatment for none."  48 C.F.R. § 3.101-1; *see* Pl.'s Cancel'n Br. at 2.  Although the government maintains that this provision merely contains non-mandatory guiding principles, its argument relies on opinions discussing FAR sections 1.102 and 1.102-2, not section 3.101-1.  S*ee* Def.'s Cancel'n Br. at 9 (discussing *Info. Sciences Corp.*, 85 Fed. Cl. at 201-02); Def.'s Cancel'n Reply at 5 & n.4 (discussing *Castle-Rose, Inc. v. United States*, No. 11-163C, 2011 WL 2550871, at *15 (Fed. Cl. June 28, 2011)).  But the Federal Circuit, in reviewing a bid protest decision, has recognized that FAR section 3.101-1 imposes requirements upon procurement officials.  *Galen Med. Assocs. v. United States*, 369 F.3d 1324, 1336 (Fed. Cir. 2004).  Many of our opinions have considered alleged violations of FAR section 3.101-1 as grounds for a bid protest, *see, e.g.*, *Def. Tech.*, 99 Fed. Cl. at 119-20; *DMS All-Star Joint Venture v. United States*, 90 Fed. Cl. 653, 672 (2010); *ViroMed Labs., Inc. v. United States*, 87 Fed. Cl. 493, 504 (2009); *Microdyne Outsourcing, Inc. v. United States*, 72 Fed. Cl. 230, 235 (2006), although typically concerning allegations of a conflict of interest.  *See KSEND v. United States*, 69 Fed. Cl. 103, 118-19 (2005) (collecting cases).  And although this section comes under the heading "Standards of conduct," 48 C.F.R. § 3.101, it is clearly mandatory --- creating the default rule that officials must act with "complete impartiality" and not provide "preferential treatment" unless specifically "authorized by statute or regulation."  48

---

[17]  Another explanation of our court's jurisdiction, not advanced by the plaintiff and thus not definitively addressed in this opinion, might be that the APA codified the background principle that administrative decisions may not be arbitrary and capricious.  *See Coastal Corp.*, 6 Cl. Ct. at 344; Raoul Berger, *Administrative Arbitrariness and Judicial Review*, 65 Colum. L. Rev. 55 (1965).  The principle would then either be grafted onto all laws under which agency officials act regarding certain rights, and an arbitrary action would violate the authorizing statutes or regulations; or a violation of this principle would be "not in accordance with law," and thus a violation of the APA.  *See* 5 U.S.C. § 706(2)(A).

[18]  The Court assumes that the government's motion to dismiss embraces this portion of the complaint.  *See supra* n.13.

C.F.R. § 3.101-1.  If this provision did not bind procurement officials, the "except as authorized" clause would be rendered nonsensical.  Accordingly, the Court finds both counts challenging the cancellation of the IT services procurement to be within our jurisdiction, and the government's motion to dismiss them is DENIED.[19]

### b.  OMB Circular A-76.

Although the preceding discussion settles the question of jurisdiction over the protest of the cancellation, the Court finds it necessary to consider one other basis for jurisdiction raised by MORI, as this affects the analysis of the merits of plaintiff's claims.  MORI argues that FAR section 7.302(b)(2)-(3) requires that agencies conduct public-private competitions following the dictates of OMB Circular A-76 before insourcing commercial activities, and calculate cost comparisons for these competitions as provided in Attachment C to the Circular.  *See* Pl.'s Cancel'n Br. at 17, 21, 27-32.[20]  On this point, the Court finds the government has the better argument.  Whether this section imposes an enforceable obligation on an agency, reviewable in our court, turns in large part on the meaning of the phrase "[a]s provided in the Circular."  48 C.F.R. § 7.302(b).  The section reads, in relevant part:

As provided in the Circular, agencies shall . . .

(2) Conduct public-private competitions in accordance with the provisions of the Circular and, as applicable, these regulations;
(3) Give appropriate consideration relative to cost when making performance decisions between agency and contractor performance in public-private competitions . . . .

48 C.F.R. § 7.302(b)(2)-(3).  To MORI, this section means that an agency must conduct a public-private competition when the Circular would call for one and must use the method of calculating costs that is contained in the Circular --- and if the agency fails to do either it thus violates a FAR provision.  *See* Pl.'s Cancel'n Reply at 10.  The government reads this section to mean that the obligations of agencies are as the Circular provides --- and the Circular specifically provides that noncompliance "shall not be interpreted to create a substantive or procedural basis to challenge agency action or inaction, except as stated in" one attachment that is not relevant to this case, and another that authorizes only a *contest* of actions taken in a *standard competition*, following the

---

[19]  In light of this jurisdictional determination, the Court finds it unnecessary to decide whether FAR sections 1.102(b)(3) or 1.102-2(c)(3) may be the basis for a claimed violation of a regulation in connection with a procurement.

[20]  Plaintiff also alleges a violation of FAR section 15.203(b), but this provision is clearly permissive and imposes no obligation on the government.  *See* 48 C.F.R. § 15.203(b) (stating that an "RFP *may* be issued") (emphasis added).

*agency* protest procedures of FAR section 33.103.  *See* Def.'s Cancel'n Br. at 11-12 (discussing OMB Circular A-76, ¶ 5(g) & Attach. B, Part F, ¶¶ 1-2).

It is reasonable to conclude that the "appropriate consideration relative to cost" that is "provided in the Circular," 48 C.F.R. § 7.302(b)(3), is the approach to calculating costs contained in Attachment C to the Circular.  But the FAR provision states that this consideration shall be given "when making performance decisions between agency and contractor performance in public-private competitions." *Id*.  Thus, if a competition were held --- standard or streamlined --- the failure to follow the Attachment C cost approach would violate a "regulation in connection with a procurement or a proposed procurement," 28 U.S.C. § 1491(b)(1), and would be answerable in our court.  MORI's problem, however, is that no public-private competition was conducted.  Thus, FAR section 7.302(b)(3) can only be said to have been violated if there exists a separate legal requirement that NIDDK conduct such a competition in the first place.

MORI contends that FAR section 7.302(b)(2) contains such a requirement.  Were this provision to expressly state that agencies must conduct public-private competitions as if OMB Circular A-76 were binding, then perhaps plaintiff's claim of a prejudicial violation of a regulation would be clearly supportable.[21]  But the natural reading of this provision is that when an agency is conducting a public-private competition, it must follow the procedures of OMB Circular A-76.  The section does not state *when* these competitions are required, unless this is accomplished by the "[a]s provided in the Circular" or the "in accordance with the provisions of the Circular" language.  *See* 48 C.F.R. § 7.302(b)(2).  Unlike other possible formulations --- such as "when required by the Circular" or "when the Circular mandates" --- this language falls short of expressing the belief that the Circular does, in certain circumstances, require that public-private competitions be conducted.  Whether the Circular requires them, then, rests solely on its own provisions.

The Circular states that "agencies shall . . . [u]se a streamlined or standard competition to determine if government personnel should perform a commercial activity," OMB Circular A-76, ¶ 4(c), and specifies that this "shall" be done "[b]efore government personnel may perform a new requirement, an expansion to an existing commercial activity, or an activity performed by the private sector." *Id*. ¶ 5(d).  But while these paragraphs from the Circular make it sound as if there is a mandatory duty to conduct these competitions, other provisions limit what can be

---

[21]  A FAR provision would not, however, trump a law passed by Congress.  The government notes that section 737 of the Omnibus Appropriations Act, 2009, forbids the use of appropriated funds "to begin or announce a study or public-private competition regarding the conversion to contractor performance of any function performed by Federal employees pursuant to" the Circular.  Omnibus Appropriations Act., Pub. L. No. 111-8, § 737, 123 Stat. 524, 691 (2009); *see* Tr. (July 27, 2011) at 101, 109.  Defendant's counsel maintains that some of the work involved in the IT procurement is being performed by government employees, but concedes that the record contains no evidence of this.  Tr. (July 27, 2011) at 109-10.

required by private parties --- disclaiming the creation of a "basis to challenge" actions or inactions concerning public-private competitions unless an agency has initiated a standard competition.  Again, the Circular "shall not be interpreted to create a substantive or procedural basis to challenge agency" decisions other than those specified in Attachments A and B, *id.* ¶ 5(g) --- and the failure of an agency to conduct a public-private competition is not among the matters that may be contested.  *See* Attach. B to *id.*, Part F, ¶¶ 1-2.[22]  Thus, by the terms of the Circular, prospective offerors have no basis to require that agencies conduct public-private competitions.

The Court thus holds that FAR section 7.302(b)(2) cannot be interpreted to require that public-private competitions be conducted, but merely governs those that are conducted.  Had NIDDK conducted a streamlined competition --- which MORI concedes that the agency could have done in compliance with the provisions of OMB Circular A-76, Tr. (July 27, 2011) at 156; *see* Attach. B to OMB Circular A-76, Part A, ¶ 5(b) --- FAR section 7.302(b)(2)-(3) would have required that the agency follow the relevant provisions of Attachments B and C.  Even though the Circular provides that "[n]o party may contest any aspect of a streamlined competition," Attach. B to OMB Circular A-76, Part F, ¶ 2, the "shalls" in the FAR section refer to "public-private competitions," 48 C.F.R. § 7.302(b)(2)-(3) --- a term which embraces both standard *and* streamlined competitions.  *See* 48 C.F.R. § 7.301 (incorporating the definitions from Attachment D to the Circular); OMB Circular A-76, Attach. D, at D-3 (definition of "Competition").[23]  When the FAR section specifically discusses the manner in which these competitions are to be conducted, and in particular the consideration to be given to cost, a mandate to follow the relevant provisions is created independent of whether the Circular would have provided for

---

[22]  Under Attachment B, an offeror:

> may contest any of the following actions taken in connection with a standard competition: (1) a solicitation; (2) the cancellation of a solicitation; (3) a determination to exclude a tender or offer from a standard competition; (4) a performance decision, including but not limited to, compliance with the costing provisions of this circular and other elements in an agency's evaluation of offers and tenders; or (5) a termination or cancellation of a contract or letter of obligation . . . .

OMB Circular A-76, Attach. B, Part F, ¶ 1.

[23]  In any event, if an agency were to use a solicitation in a streamlined competition, *see* 48 C.F.R. §§ 7.305(b), 52.207-2, a variety of scenarios could result in a bid protest in our court --- including allegations of improper cancellation, failure to follow Circular provisions incorporated by reference into the solicitation, and improper award of a contract.  *Cf.* 28 U.S.C. § 1491(b)(5) (recognizing Tucker Act jurisdiction over protests relating to OMB Circular A-76 competitions); *Fed. Mgmt. Sys., Inc. v. United States*, 61 Fed. Cl. 364, 368-70 (2004) (determining that cancellation of solicitation did not violate incorporated terms of prior version of OMB Circular A-76); *Rust Constructors Inc. v. United States*, 49 Fed. Cl. 490, 494-96 (2001) (same).

enforcement. [24]  It is only for matters about which the FAR section is silent, such as when such competitions must take place, that one must turn to the Circular to determine if a requirement is implicit.

Since no public-private competition was conducted, a regulation mandating how these are to be conducted was not violated, and MORI's case cannot rest on an alleged violation of FAR section 7.302(b)(2)-(3) --- or, by incorporation, of Attachment C of the Circular.  As we shall see, this does not, however, mean that Attachment C is irrelevant to the Court's analysis of the arbitrariness of a solicitation cancellation.

### 2.  Help Desk Solicitation

Plaintiff contends that the Court has jurisdiction under 28 U.S.C. § 1491(b)(1) to hear its challenge to the issuance of the Help Desk Solicitation, as it alleges the prejudicial violation of a regulation in connection with a procurement or proposed procurement.  Pl.'s Help Desk Br. at 17-19.  Specifically, Count VIII of the Complaint alleges that NIDDK violated 48 C.F.R. § 19.502-2(b) when it decided to issue the Help Desk Solicitation without conducting the Rule of Two analysis to determine if a small business set-aside was required.  Compl. ¶¶ 200-05.  MORI explains that it is not challenging the issuance of a task order, but rather the failure of the agency to take the preliminary step of conducting the Rule of Two analysis before selecting a procurement vehicle that cannot reserve the award for a small business.  Pl.'s Resp. Gov't Mot. Dismiss (July 21, 2011) ("Pl.'s Help Desk Reply") at 6.  Plaintiff notes that the GAO considers such challenges to be against the underlying solicitation for the ID/IQ contracts to which an agency seeks to transfer work in lieu of a small business set-aside.  *Id*. at 6-8 (citing *LBM, Inc.*, 2002 CPD ¶ 157, 2002 U.S. Comp. Gen. LEXIS 138, at *8-10 (Comp. Gen. Sept. 18, 2002); *N&N Travel & Tours, Inc.*, 2000 CPD ¶ 146, 2000 U.S. Comp. Gen. LEXIS 128, at *12-13 (Comp. Gen. Aug. 31, 2000)).

The government moves under RCFC 12(b)(1) and 12(b)(6) to dismiss Count VIII of the Complaint. [25]  Def.'s Help Desk Br. at 1, 7-14.  Defendant maintains that MORI is challenging the issuance of a task order, and that such a protest is beyond our jurisdiction due to a provision of the Federal Acquisition Streamlining Act of 1994 ("FASA").  *Id*. at 7 (citing 41 U.S.C.A.

---

[24]  To this extent FAR section 7.302(b)(3) is similar to the solicitation at issue in *International Graphics, Division of Moore Business Forms, Inc. v. United States*, 4 Cl. Ct. 186 (1983), which incorporated the cost comparison provisions of the version of the Circular in effect at the time. *Id*. at 189, 198-99.  The difference is that in this case no solicitation was used and no public-private competition conducted.

[25]  Count VI of the Complaint includes the allegation that the improper issuance of the Help Desk Solicitation in violation of 48 C.F.R. § 19.502-2(b) was done in bad faith, thereby also violating 48 C.F.R. § 3.101-1.  The Court construes the motion to dismiss regarding the Help Desk Solicitation claim as encompassing this portion of Count VI as well as Count VIII.

§ 4106(f)(1)).  The FASA provision in question states that "[a] protest is not authorized in connection with the issuance or proposed issuance of a task or delivery order except for" circumstances not relevant to this case.  41 U.S.C.A. § 4106(f)(1) (West Supp. 2011).  It also contains a clause which seemingly sunset the limitation on such protests as of May 27, 2011.  41 U.S.C.A. § 4106(f)(3).  The government argues that the legislative history of the sunset provision shows it was meant to apply only to language extending to the GAO the exclusive jurisdiction to hear protests of task orders greater than $10 million, and not the limitations on protest jurisdiction.  Def.'s Help Desk Br. at 8.  Defendant disagrees with the interpretations to the contrary from the GAO, *see Technatomy Corp.*, No. B-405130, 2011 WL 2321836 (Comp. Gen. June 14, 2011), and from our court, *see MED Trends, Inc. v. United States*, No. 11-420C, 2011 WL 4037418 (Fed. Cl. Sept. 13, 2011), arguing that these failed to follow the Federal Circuit's approach to the use of legislative history in *Glaxo Operations UK Ltd. v. Quigg*, 894 F.2d 392, 395-96 (Fed. Cir. 1990).  Def.'s Help Desk Br. at 8-10 & n.6; Def.'s Supp'l Br. (Sept. 21, 2011) ("Def.'s Supp'l Br. II") at 1-3 & n.2.

The government also argues that MORI waived its right to challenge the task order based on an alleged violation of 48 C.F.R. § 19.502-2(b) because it failed to do so while the NITAAC solicitation for the ID/IQ contract was open back in 2000.  Def.'s Help Desk Br. at 11 (citing *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1313 (Fed. Cir. 2007) and *Datamaxx Group, Inc.*, 2008 CPD ¶ 231, 2008 WL 5397147 (Comp. Gen. Dec. 18, 2008)).  Defendant notes that both categories of positions sought to be filled through the Help Desk Solicitation --- Help Desk Manager and Help Desk Specialist --- were among the personnel included under the NITAAC CIO-SP2i contract.  *Id.* at 12.  Thus, it contends MORI was on notice in 2000 that the NITAAC contract vehicle could be used to perform this type of work for NIH and its parts.  *Id.*

In response, MORI argues it would have had no reason to protest the CIO-SP2i award in 2000, one year before NIDDK awarded it a contract including Help Desk services.  Pl.'s Help Desk Reply at 11.  Plaintiff argues that its protest is timely because it could not have foreseen that the Help Desk work would be transferred to the NITAAC CIO-SP2i contract vehicle in 2011.  *Id.* at 14.  And it urges the court to follow the reasoning of the *MED Trends* opinion.  Pl.'s Resp. to Ct.'s Order (Sept. 21, 2011) ("Pl.'s Supp'l Br.") at 1-3 (citing *MED Trends*, 2011 U.S. Claims LEXIS 1872, at *11, 14-16).[26]

---

[26]  Although the Court recognizes the time pressure counsel for the parties was under to file supplemental briefs within one week, the Court was disappointed to find that plaintiff cited the arguments of a party recounted in one opinion as if these were the views of our court, *see* Pl.'s Supp'l Br. at 13 (quoting *Gear Wizzard, Inc. v. United States*, 99 Fed. Cl. 266, 277 (2011)), and that defendant referred to the Court in a tone one would normally reserve for an adversary.  *See* Def.'s Supp'l Br. II at 5 (stating "[t]he Court cannot evade this jurisdictional limitation" and would potentially "create a back-door way to enjoin").

### a.  Not connected to the proposed issuance of a task order.

The Court first considers MORI's claim that, regardless of the viability of the ban on task order protests, its protest is not "in connection with the issuance or proposed issuance of a task or delivery order." 41 U.S.C.A. § 4106(f)(1).  This argument requires an understanding of the nature of the regulatory obligation that the agency allegedly ignored.  The relevant FAR provision implements the Small Business Act requirement that:

> [S]mall-business concerns . . . shall receive any award or contract or any part thereof . . . as to which it is determined . . . (3) to be in the interest of assuring that a fair proportion of the total purchases and contracts for property and services for the Government in each industry category are placed with small-business concerns. . . .

15 U.S.C. § 644(a) (2006); *see Delex Sys., Inc.*, 2008 CPD ¶ 181, 2008 U.S. Comp. Gen. LEXIS 170, at *13 (Comp. Gen. Oct. 8, 2008).[27]  To assure small business's fair proportion, under the so-called Rule of Two a "contracting officer shall set aside any acquisition over $150,000 for small business participation when there is a reasonable expectation that (1) offers will be obtained from at least two responsible small business concerns . . . and (2) award will be made at fair market prices."  48 C.F.R. § 19.502-2(b).

Orders from the GSA FSS, like the one NIDDK attempted in the cancelled IT services procurement, are specifically exempted from most provisions in FAR Part 19, including the Rule of Two.  48 C.F.R. § 8.404(a) (providing that of Part 19, only "the requirement at 19.202-1(e)(1)(iii)" applies to FSS orders); *see also* 48 C.F.R. § 19.502-1(b).  Thus, if the Rule of Two were relevant only at that point in the procurement process, use of that contract vehicle would allow agencies to avoid following the policies of the Small Business Act.  MORI contends, however, that the obligation to apply the Rule of Two falls upon contracting officers *before* the ordering stage of the process, as they must know whether a contract must be set aside for small businesses before they can choose the appropriate procurement vehicle.  MORI explains that procurements that should be set aside for small businesses may be conducted through the FSS where, as in the IT services procurement, the solicitation includes small business status as a primary evaluation factor.  *See* Pl.'s Help Desk Reply at 11 n.5; Pl.'s Help Desk Br. at 14; Tr. (July 27, 2011) at 66-67.

Unlike the treatment of FSS orders, nothing in the FAR provisions pertaining to task orders, or in FASA itself, exempts those purchases from the Rule of Two.  *See* 48 C.F.R. Subpart 16.5; 10 U.S.C. §§ 2304a-2304d; 41 U.S.C.A. § 4101-06; *Delex Sys.*, 2008 U.S. Comp. Gen. LEXIS 170, at *14 (concluding "nothing in CICA or FASA would exempt task or delivery orders

---

[27]  This passage from the Small Business Act ends with the qualification:  "A contract may not be awarded under this subsection if the award of the contract would result in a cost to the awarding agency which exceeds a fair market price."  15 U.S.C. § 644(a) (2006).

--- and certainly nothing explicitly exempts them --- from the requirements of FAR § 19.502-2(b)").  Thus, the GAO has concluded that the Rule of Two must be applied when an agency is competing a task order using a pool of multiple-award ID/IQ contract holders which includes small businesses.  *Delex Sys.*, 2008 U.S. Comp. Gen. LEXIS 170, at *19-22.  It explained:

> Competitions for task and delivery orders are the stage when holders of multiple-award ID/IQ contracts offer prices and solutions to meet specific agency needs. This is therefore the most meaningful stage for a Rule of Two analysis, in which the contracting officer needs to judge the likelihood of receiving at least two fair-market priced submissions from small businesses for the services or supplies being acquired under a specific solicitation.

*Id.*, at *18.  Since, in the GAO's view, task orders could be set aside for small businesses,[28] the Rule of Two analysis is required by an agency before it competes a task order among the general pool of ID/IQ contract holders --- as a reasonable expectation that at least two responsible small businesses will submit offers allowing an award at a fair market price requires the award to be set aside for small businesses.  *Id.*, at *21-22.

 But is this the *only* stage in the acquisition process at which the Rule of Two analysis should be performed?  As defined in the FAR, an acquisition consists of many steps:

> Acquisition begins at the point when agency needs are established and includes the description of requirements to satisfy agency needs, solicitation and selection of sources, award of contracts, contract financing, contract performance, contract administration, and those technical and management functions directly related to the process of fulfilling agency needs by contract.

48 C.F.R. § 2.101 (2010).  Obviously, any decision to set aside an acquisition exclusively for small businesses must be made prior to the stage when a source is selected and a contract is

---

[28]  A law signed roughly two years after the *Delex Systems* opinion amended the Small Business Act to clarify that agencies could "set aside orders placed against multiple award contracts for small business concerns."  15 U.S.C.A. § 644(r)(2) (West Supp. 2011).  This law required the issuance of regulations to provide "guidance" to agencies so that they "may, at their discretion" employ these set-asides.  15 U.S.C.A. § 644(r).  The interim rule recently issued allows task order set-asides at the contracting officer's discretion, and requires no written justification.  76 Fed. Reg. 68032, 68034-35 (Nov. 2, 2011) (enacting new 48 C.F.R. §§ 16.505(b)(2)(i)(F) & 16.505(b)(2)(ii)).  Subpart 19.5 of the FAR was amended to add this discretionary authority.  *Id.* at 68035 (enacting new 48 C.F.R. § 19.502-4).  Presumably, this new discretionary authority either supplements or may be used to carry out the mandatory responsibility to set aside acquisitions under the Rule of Two.  *See* 48 C.F.R. § 19.502-2(b).

-27-

awarded.[29] If an agency seeks to acquire services from a pool of offerors that has already been restricted --- by being limited to multiple award task order contract holders, for instance --- and this pool has no small businesses, the selection of the vehicle has made the Rule of Two analysis an empty gesture.  One cannot reasonably expect small business offers when small businesses are not allowed to submit offers.  Thus, as MORI points out, Pl.'s Help Desk Reply at 9, the Small Business Administration has taken the position that "the FAR requires an agency to consider the suitability of an upcoming requirement for performance by small business first, while conducting acquisition planning," and believed that "[i]f such planning reveals that the requirement should be set aside for small businesses . . . the procuring agency must then select a procurement vehicle consistent with the requirement for a set-aside."  *Datamaxx Group, Inc.*, 2008 CPD ¶ 231, 2008 U.S. Comp. Gen. LEXIS 216, at *11-12 (Comp. Gen. Dec. 18, 2008).

The Court looks to the opinions of the GAO, which can be persuasive, for guidance on this point.  The GAO, however, has taken multiple approaches to the issue of when the Rule of Two analysis should be conducted.  As noted above, in the context of a protest from a small business holding an ID/IQ contract (and when a protest connected to the issuance of a task order posed no jurisdictional difficulties), it thought "the most meaningful stage for a Rule of Two analysis" was when competition for a task order was to occur.  *Delex Sys.*, 2008 U.S. Comp. Gen. LEXIS 170, at *18.[30]  On the other hand, when the protester did not hold one of these contracts (and when facing a jurisdictional bar on protests connected to the issuance of task orders), the GAO determined that an alleged failure to conduct the set-aside analysis concerned a "question of whether the solicitation for the underlying ID/IQ contracts properly included" the services the protester sought to have set aside, and was thus "a challenge to the terms of the underlying solicitation" rather than to a task order.  *N&N Travel & Tours, Inc.*, 2000 CPD ¶ 146, 2000 U.S. Comp. Gen. LEXIS 128, at *13 (Comp. Gen. Aug. 31, 2000).  Under this approach, before placing required work among the possible topics of task orders described in a solicitation leading to the award of multiple ID/IQ contracts, an agency must first determine if the work must be set aside for small businesses.

By identifying a multiple award ID/IQ solicitation as the *result* of the required Rule of Two analysis, the GAO yoked the timeliness rule for protests of solicitation terms to Rule of Two challenges.  Under the timeliness rule, which the Federal Circuit has adopted for bid protests in our court, "a party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection afterwards."  *Blue & Gold Fleet, L.P. v. United States*, 492

---

[29]  At that stage a non-exclusive "cascading" procurement procedure can be used, in which small businesses are given first consideration.  *See Chapman Law Firm Co. v. Greenleaf Constr. Co.*, 490 F.3d 934, 936 (Fed. Cir. 2007).

[30]  The *Delex Systems* protest concerned a task order valued at over $75 million, *see* 2008 U.S. Comp. Gen. LEXIS 170, at *6, and was brought at a time when the GAO had exclusive jurisdiction over protests of orders in excess of $10 million.  *See* 10 U.S.C. § 2304c(e)(2) (2006).

F.3d 1308, 1315 (Fed. Cir. 2007).  But unless the particular requirement is contained in a sample task order that will be awarded at the time multiple ID/IQ contracts are awarded, it will always be the case that the bidding process for the ID/IQ contracts will close well before individual task orders are competed among the awardees.  Thus, protesters proceeding before the GAO under the theory that they are challenging the terms of the solicitation for the ID/IQ contracts must demonstrate that the impropriety in the solicitation is not patent.

Applying the waiver rule in this context, the GAO distinguishes between ID/IQ contracts that had "very broad or vague statements of work" and those which gave "clear notice of the agency's intention to procure particular requirements."  *Datamaxx Group, Inc.*, 2008 U.S. Comp. Gen. LEXIS 216, at *13-14.  Protests involving solicitations in the former category are timely, and those concerning the latter are not.  The GAO considers, among other things, whether the particular work had been set aside for small businesses prior to the issuance of the ID/IQ contract solicitation; whether the agencies involved gave the impression that they did not anticipate this work to be ordered under the resulting ID/IQ contracts when the solicitation issued; and whether "specific projects at particular locations were identified."  *LBM, Inc.*, 2002 CPD ¶ 157, 2002 U.S. Comp. Gen. LEXIS 138, at *4 (Comp. Gen. Sept. 18, 2002); s*ee also id.* at *3, 9, 11-13; *N&N Travel & Tours,* 2000 U.S. Comp. Gen. LEXIS 128, at *4-5, 14-16.  The GAO succinctly explained:

> In our view, it is unreasonable to require a small business that believes that one specific acquisition should continue to be set aside for small businesses to identify the possibility, at the time proposals for ID/IQ contracts to perform a broad and undefined scope of work are solicited, that the specific, and relatively small, acquisition it is interested in may ultimately be transferred to the ID/IQ contracts.

*LBM*, 2002 U.S. Comp. Gen. LEXIS 138, at *11.

While the Court agrees with this conclusion, it cannot agree with the view that these protests are challenges to the terms of the ID/IQ solicitations --- at least where the solicitations did not identify the specific work at the particular location which the protester contends should be set aside.  It is not inappropriate to focus, as the GAO has, on the burden that would be placed on small businesses if they had to protest any solicitation which might be interpreted to encompass the work they have been performing under contract.  But the consideration of two other burdens make it clear to the Court that this type of protest --- based on the failure to conduct Rule of Two analysis before committing an acquisition to a vehicle that excludes small businesses --- is not a challenge to the terms of that vehicle's solicitation.

First, even when work performed for an agency by a small business fits neatly (but not with specificity) within the scope of multiple award task order contracts issued by that agency, the burden on these businesses to challenge the terms of the solicitation for those contracts would still be unreasonable.  By issuing the solicitation, an agency is not committing itself to any purchases other than the minimum amounts identified (unless a sample task order used as an

evaluation factor is also awarded). *See* 48 C.F.R. § 16.504(a). These solicitations seek proposals from businesses who would be *available* to fill future orders of supplies or services, were the agency *to choose* to use the ID/IQ contracts as the vehicle to satisfy any of their needs. But that choice still must be made, and the awarding of multiple ID/IQ contracts does not place any restrictions on the agency's range of decision. Just because particular work *could* be assigned to these contracts does not mean that it *will* be. The mere fact that work fits within the general scope of the ID/IQ contracts is no indication that when the agency considers its particular needs, it will conclude that use of those contracts is desirable (particularly if the agency is required to follow other mandates, such as 48 C.F.R. § 19.502-2(b)). Viewing the Rule of Two protests as challenges to the solicitations' terms is tantamount to presuming that every specific job that falls in a category for which ID/IQ contracts are available *will* be ordered through that vehicle, even though the agency had not yet considered the circumstances of that specific need and definitively decided to use the ID/IQ vehicle. This would result in numerous unnecessary protests concerning contract work performed by small businesses that never would have been transferred to the ID/IQ contracts. Delaying the awards of the ID/IQ contracts while agencies are bogged down in such unnecessary protests would be inefficient, costly to the small business protesters, and discourage agencies from making these vehicles available.

A second consideration is the burden that is implicitly placed on agencies if these protests are viewed as challenges to the terms of the ID/IQ solicitations. Within any category of work, whether two small businesses are available to perform a particular requirement at a market price will depend on a variety of factors concerning that requirement, such as the size of the work, its location and timing, and the combination of functions needed. Take, for example, the work performed by a "Help Desk Specialist," which is described in the CIO-SP2i contract as "[p]rovid[ing] phone and in-person support to users in the areas of e-mail, directories, standard Windows desktop applications, and applications developed under" that or predecessor contracts, and "[s]erv[ing] as the initial point of contact for troubleshooting hardware/software PC and printer problems." App. to Def.'s Help Desk Br. at 24. It seems inconceivable that no two small businesses could perform such services at a market price to meet *any* requirement of *any* federal agency, although it is probable that none would be available in particular circumstances. But if MORI's Rule of Two protest is considered a challenge to the CIO-SP2i contract solicitation's terms, this means that the agency was expected to conduct the Rule of Two analysis before placing this (or, indeed, any) category of work under the solicitation.[31] When soliciting proposals for such contracts, then, an agency would have to either determine that no particular need of that agency could be filled at a market price by as many as two responsible small businesses before placing the work's category in the solicitation --- or it would be violating 48 C.F.R. § 19.502-2(b) (unless specific exclusions are made for the particular needs that should be set aside). It is unrealistic in the extreme to expect an agency to identify every potential order that comes under the scope of an ID/IQ multiple award solicitation and perform this analysis

---

[31] The CIO-SP2i contract covered seventy-one personnel categories. App. to Def.'s Help Desk Br. at 20-23.

prior to issuing the solicitation.  This burden would be particularly crippling for a government-wide acquisition contract ("GWAC"), like the NITAAC, were an agency required to conduct the analysis for every need of every federal agency which might use the GWAC.

One additional consideration militates against considering these types of protests to be challenges to ID/IQ solicitations' terms.  History shows that hundreds of thousands of small businesses performing high technology services are opened each year, and one-third of new businesses survive at least ten years.[32]  The government concedes that there is rapid change in the IT services field.  *See* Tr. (July 27, 2011) at 89.  It would hardly serve the purpose of setting aside government contracts for small businesses if the existence of responsible small businesses capable of providing required services at market prices was to be ignored, merely because the businesses were not alive when multiple ID/IQ contracts were awarded a decade earlier and thus failed to protest the terms of the solicitation for those contracts.  But this would be the result if Rule of Two protests such as this one are considered to be challenges to the terms of such solicitations --- the realities of the current marketplace are disregarded in favor of the fiction that an agency conducted Rule of Two analyses for needs it may not have even contemplated at the distant time multiple-award ID/IQ contracts were solicited.

There is nothing in 48 C.F.R. § 19.502-2(b) to suggest that the Rule of Two set-aside decision must be made at the time an indefinite solicitation, such as those for multiple award ID/IQ contracts, is written and issued.  The provision concerns "any acquisition over $150,000," 48 C.F.R. § 19.502-2(b), and an acquisition is defined as "the acquiring by contract with appropriated funds of supplies or services . . . by and for the use of the Federal Government through purchase or lease."  48 C.F.R. § 2.101.  As was noted above, an acquisition "begins at the point when agency needs are established and includes the description of requirements to satisfy agency needs."  *Id.*  The mere listing of categories of work in a multiple award ID/IQ solicitation does not establish the particular needs of an agency nor describe the requirements to meet them, and the resulting contracts do not constitute the acquisition of supplies or services (other than, perhaps, the service of being available for task orders).  Thus, unless a specific project is identified in these solicitations, such as a sample task order, the solicitation of offers and award of multiple task order contracts are not part of an acquisition --- the acquisitions begin later, when specific needs are established.  These awards represent no more than a potential vehicle for satisfying needs to be established in the future.

When an agency skips past the step of conducting Rule of Two analysis and proceeds with the plan of obtaining services through task order contracts, this does not, however, mean

---

[32]  According to information available at the Small Business Administration's website, from 2005 through 2009 the number of new businesses opening in the United States exceeded on average 600,000 annually; one-third of businesses last at least ten years; and small businesses employ forty-three percent of our country's high technology workers.  *See Frequently Asked Questions*, SBA.gov, http://www.sba.gov/sites/default/files/sbfaq.pdf  (last visited Dec. 15, 2011).

that a protest in response by an interested small business is one "in connection with the issuance or proposed issuance of a task or delivery order."  41 U.S.C.A. § 4106(f)(1).  Merely because this failure to follow 48 C.F.R. § 19.502-2(b), if left unchecked, would ultimately result in the issuance of a task order does not necessarily connect a protest of that failure with that hypothetical order --- which might never be proposed if the protest succeeds.  There is no reason to believe that the phrase "in connection with," when used in FASA, has the same sweeping meaning as when used in the ADRA.  *See Global Computer Enters., Inc. v. United States*, 88 Fed. Cl. 350, 407-10 (2009).  To be sure, the protest is in connection with *a procurement*, but the Federal Circuit has held that for purposes of the ADRA "'procurement' includes all stages of the process of acquiring property or services, beginning with the process for determining a need for property or services and ending with contract completion and closeout."  *Distributed Solutions, Inc. v. United States*, 539 F.3d 1340, 1345 (Fed. Cir. 2008) (adopting and quoting 41 U.S.C. § 403(2)).  The actual acquisition begins when an agency's needs are established, 48 C.F.R. § 2.101, and the set-aside decision, to be meaningful, must occur prior to the selection of the vehicle to be used to satisfy these needs, since certain vehicles may exclude small businesses.  As explained above, contracting officers cannot reasonably expect small businesses to submit offers if they do not allow them to do so.

The "procurement," then, which this Rule of Two protest concerns, is a "stage of the process of acquiring property or services" that falls after the establishment of the particular agency needs, but before the choice of the vehicle to satisfy these needs.  *See* 48 C.F.R. § 7.105(b)(1) & (b)(4)(ii)(B)(*2*) (2010) (describing the consideration of prospective sources, including small businesses, in written acquisition plans).  This is a logically distinct step from the issuance or proposed issuance of task orders, which presupposes the selection of a multiple award task order contract vehicle to begin with.[33]  Since at this stage an agency could just as well choose not to go down the task order road as to follow it, this choice is not "in connection with the issuance or proposed issuance of a task or delivery order" any more than it is in connection with an order using the GSA FSS, or with a negotiated procurement under FAR Part 15, or any other option at the agency's disposal.  Thus, the 41 U.S.C.A. § 4106(f)(1) limit on protests does not preclude our jurisdiction over MORI's Help Desk Solicitation claims.

In any event, even if this aspect of plaintiff's protest were considered a challenge to the terms of the CIO-SP2i contract solicitation, the Court concludes that these claims are not untimely.  The inclusion of two help desk categories of personnel (Help Desk Manager and Help Desk Specialist) in a list of seventy-one types of information technology personnel, *see* App. to Def.'s Help Desk Br. at 20-24, compiled for multiple award ID/IQ contracts available for use by the NIH generally as well as other agencies, did not put small businesses on notice that the NIDDK help desk work was to be transferred to the CIO-SP2i contracts.  Given the broad scope of work involved, in the absence of descriptions of "specific projects at particular locations,"

---

[33]  The issuance (or proposed issuance) of task orders occurs after a source has been selected among the task order contract holders, and a protest in connection with this presumably concerns *that* decision, not the decision to use the task order contracts to obtain the relevant services.

small businesses could not know that the work they were performing would be brought under this vehicle. *See LBM*, 2002 U.S. Comp. Gen. LEXIS 138, at *4. Moreover, it is clear that NIH had not considered assigning the NIDDK help desk work to the CIO-SP2i contracts when the solicitation for those contracts was still open, as the NIDDK subsequently awarded small business contracts to MORI that included this work, *see* App. to Pl.'s Help Desk Reply at 1-16, and the work was part of the IT Services Solicitation issued in 2007. *See id*. at 25-26. Thus, the Rule of Two analysis was not relevant when the NITAAC solicitation was open, but only became relevant once the NIDDK attempted to transfer the work to the CIO-SP2i contracts. *See LBM*, 2002 U.S. Comp. Gen. LEXIS 138, at *13-14. And finally, the CIO-SP2i contracts, as solicited, were to have expired before the Help Desk Solicitation was issued. *See* App. to Def.'s Help Desk Br. at 16 (showing expiration date of December 20, 2010). Since a modification to extend these contracts one year, *see id*. at 26, and not the terms of the original solicitation, was necessary for NIDDK to transfer the help desk services work to the CIO-SP2i contracts, MORI could not have been on notice when those contracts were being solicited that they could be used in 2011 as a vehicle to award this work.

### b.  Limits on protests connected with task orders have expired.

Even if MORI's protest regarding the Help Desk Solicitation were considered to be connected with the proposed issuance of a task order, the Court is of the opinion that there exists no obstacle to the exercise of jurisdiction over this protest. The government points to a portion of FASA as amended, most recently codified at 41 U.S.C.A. § 4106(f),[34] as limiting our court's jurisdiction over task order protests. Def.'s Help Desk Br. at 7-10. The corresponding provision enacted as part of FASA had read:

**(d) Protests**

   A protest is not authorized in connection with the issuance or proposed issuance of a task or delivery order except for a protest on the ground that the order increases the scope, period, or maximum value of the contract under which the order is issued.

41 U.S.C. § 253j(d) (2006).

On January 28, 2008, President George W. Bush signed into law an act of Congress which, among other things, amended the relevant FASA provision concerning protests. *See* National Defense Authorization Act for Fiscal Year 2008 ("2008 NDAA"), Pub. L. No. 110-181,

---

[34]  The provision was previously found at 41 U.S.C. § 253j(e) (Supp. III 2010). *See* Pub. L. No. 111-350, § 7(b), 124 Stat. 3677, 3857 (2011) (table showing previous section 253j was replaced by section 4106).

§ 843(b)(2)(C), 122 Stat. 3, 239 (2008).[35]  After redesignating subsection (d) as subsection (e), the amendment began "by striking subsection (e)" and finished by "inserting the following new subsection (e):"

> (e) PROTESTS. -- (1) A protest is not authorized in connection with the issuance or proposed issuance of a task or delivery order except for--
> (A) a protest on the ground that the order increases the scope, period, or maximum value of the contract under which the order is issued; or
> (B) a protest of an order valued in excess of $10,000,000.
> (2)  Notwithstanding section 3556 of title 31, United States Code, the Comptroller General of the United States shall have exclusive jurisdiction of a protest authorized under paragraph (1)(B).
> (3)  This subsection shall be in effect for three years, beginning on the date that is 120 days after the date of the enactment of the National Defense Authorization Act for Fiscal Year 2008.

*Id*.  (amending then 41 U.S.C. § 253j).

Nearly three years later, Congress passed an act which revised and re-enacted title 41 of the United States Code.  Pub. L. No. 111-350, §§ 2-3, 124 Stat. 3677 (2011).  In a subsection of the act entitled "CONFORMITY WITH ORIGINAL INTENT," Congress stated that "[i]n the codification of laws by this Act, the intent is to conform to the understood policy, intent, and purpose of Congress in the original enactments, with such amendments and corrections as will remove ambiguities, contradictions, and other imperfections . . . ."  *Id*. § 2(b).  The relevant FASA provision was moved to a new Chapter 41 of title 41, and now reads:

> (f) PROTESTS.--
> (1) PROTEST NOT AUTHORIZED.--A protest is not authorized in connection with the issuance or proposed issuance of a task or delivery order except for--
> (A) a protest on the ground that the order increases the scope, period, or maximum value of the contract under which the order is issued; or
> (B) a protest of an order valued in excess of $10,000,000.
> (2) JURISDICTION OVER PROTESTS.---Notwithstanding section 3556 of title 31, the Comptroller General shall have exclusive jurisdiction of a protest authorized under paragraph (1)(B).
> (3) EFFECTIVE PERIOD.---This subsection shall be in effect for three years, beginning on the date that is 120 days after January 28, 2008.

---

[35]  The FASA counterpart to this provision concerning military contracts was also amended in the identical manner.  *See* 2008 NDAA, Pub. L. No. 110-181, § 843(a)(2)(C), 122 Stat. 3, 237 (2008) (amending 10 U.S.C. § 2304c(e)).

*Id*. § 3, 124 Stat. at 3783 (enacting 41 U.S.C. § 4106(f)).  Other than a new sub-heading, the only change to the sunset provision was the inclusion of the actual date of enactment of the 2008 NDAA.

Three days after the enactment of the act re-codifying title 41, another act of Congress was signed into law by the President, authorizing national defense appropriations and concerning related matters.  Ike Skelton National Defense Authorization Act for Fiscal Year 2011 ("2011 NDAA"), Pub. L. No. 111-383, 124 Stat. 4137 (2011).[36]  This act amended the sunset provision relating to protests of military contract task orders, *id*. § 825, 124 Stat. at 4270 --- which when added in the 2008 NDAA had identical language to the civilian agency contracts counterpart.  *See supra* note 35.  The defense contracts provision now reads:  "Paragraph (1)(B) and paragraph (2) of this subsection shall not be in effect after September 30, 2016."  10 U.S.C. § 2304c(e)(3) (Supp. IV 2011).  In another section of this act, concerning technical and clerical amendments to prior legislation, the task order section of the 2008 NDAA is corrected to accurately reflect that the redesignation of the protests subsections had been accomplished by "subparagraph (A)" (of paragraph (2)) and not by "paragraph (1)" in the defense and civilian agency portions of that section.  2011 NDAA, § 1075(f)(5), 124 Stat. at 4376.

Thus, as things now stand, the plain and unambiguous statutory language passed by two Congresses and signed by two presidents indicates that the limitations on protests of civilian agency task orders, contained in subsection (f) of section 4106 of title 41 of the United States Code, were only effective for a three year period beginning May 27, 2008.  This same conclusion was reached in persuasive opinions of our court and the GAO.  *See MED Trends*, 2011 WL 4037418, at *3-5; *Technatomy Corp.*, 2011 WL 2321836, at *3-4.  To recap, in the 2008 NDAA Congress took the old provision limiting protests, which it referred to as "subsection (d)" of then 41 U.S.C. § 253j, redesignated it as "subsection (e)," then struck it and replaced it with what it called a "new subsection (e)."  2008 NDAA, § 843(b)(2), 122 Stat. at 238-39.  A subpart of this new subsection contained a clause which sunset "[t]his subsection."  41 U.S.C. § 253j(e) (Supp. III 2010).  The portion of the subsection which provided for protests of task orders of a value greater than $10,000,000, *id*. § 253j(e)(1)(B), was described as "paragraph 1(B)" in another portion of the subsection.  *Id*. § 253j(e)(2).  And the same terms --- "paragraph 1(B)" and "subsection" --- were retained when Congress re-codified title 41.  *See* 41 U.S.C.A. § 4106(f).  When the sunset clause refers to "[t]his subsection," this plainly and obviously refers to the entire portion under what was once "new subsection (e)," and is now subsection (f) of section 4106.

Merely by reviewing the acts in question, the convention followed by Congress is easily understood.  The first level of subdivisions of a section of law are termed subsections, the next levels are paragraphs, and next come subparagraphs.  The term used to describe a particular

---

[36]  The two acts were passed within a week of each other.  *See* 156 Cong. Rec. H8944-45 (daily ed. Dec. 22, 2010) (final passage of what became Pub. L. No. 111-383); 156 Cong. Rec. H8535-36 (daily ed. Dec. 16, 2010) (final passage of what became Pub. L. No. 111-350).

provision will depend on whether a higher level either has already been referenced or subsumes both the provision doing the referencing and the one referenced.  Thus, language in one section referencing that of another in the same title will refer to the latter as a *section*, even if it is identified down to the subsection level.  *See* 2008 NDAA, § 843(b)(2)(B), 122 Stat. at 239 (in which 41 U.S.C. § 253j(d)(5) references "section 303B(e)").  And language in one subparagraph will use *subsection* to refer to something at the paragraph level, if the latter is in a *different* subsection.  *See id.*, § 844(a)(1) (in which 41 U.S.C. § 253(j)(1)(A) references "subsection (f)(1)").  When Congress uses the term "[t]his subsection" at the paragraph level, it can only be referring to the subsection that includes that paragraph --- in this case, 41 U.S.C.A. § 4106(f).

The government argues, however, that in using the term "[t]his subsection," what Congress meant was "paragraph (1)(B) and paragraph (2)," and that this is clearly shown by the legislative history of the provision.  *See* Def.'s Help Desk Br. at 8-9.  Defendant does not dispute that the plain meaning of 41 U.S.C.A. § 4106(f)(3) is that the subsection (f) limitations on civilian agency task order bid protests are no longer law.  It contends, rather, that the Federal Circuit has held that even in these circumstances "the legislative history should usually be examined at least 'to determine whether there is a *clearly expressed* legislative intention contrary to the statutory language.'"  *Glaxo*, 894 F.2d at 395 (emphasis added by *Glaxo* court) (quoting *Madison Galleries, Ltd. v. United States*, 870 F.2d 627, 629 (Fed. Cir. 1989)); *see* Def.'s Help Desk Br. at 8.  The government acknowledges that an "extraordinary showing of contrary intentions," *Glaxo*, 894 F.2d at 396, would need to be found in the legislative history to overcome clear and plain statutory language, because when statutory terms are found to be unambiguous, "judicial inquiry is complete except in 'rare and exceptional circumstances.'"  *Garcia v. United States*, 469 U.S. 70, 75 (1984) (quoting *TVA v. Hill*, 437 U.S. 153, 187 n.33 (1978)); *see* Def.'s Help Desk Br. at 8.  And defendant rejects the well-reasoned analysis in the *MED Trends* opinion --- in which the court relied on *Crooks v. Harrelson*¸ 282 U.S. 55, 59-60 (1930) for the proposition "that the meaning of even straightforward statutes can be subject to modification upon resort to legislative history . . . only when a straightforward reading leads to an absurd result," *MED Trends*, 2011 WL 4037418, at *5 --- because the court "failed to address *Glaxo*."  Def.'s Supp'l Br. II at 2.[37]

It is puzzling that the government would focus on the 1990 *Glaxo* opinion, and overlook the two subsequent decades of decisions concerning this topic.  In so doing, the government seems to have missed the Supreme Court's shift in approach to the question of when courts may depart from plain statutory language, and its resulting impact on Federal Circuit decisions.  But

---

[37] The government also criticizes the *MED Trends* decision for not recognizing that *Crooks* notes that "a court can depart from the apparent plain meaning of a statute where there is 'something to make plain the intent of Congress that the letter of the statute is not to prevail.'"  Def.'s Supp'l Br. II at 2 (quoting *Crooks*, 282 U.S. at 60).  But the quote from *Crooks* is truncated, with the beginning phrase "And there must be" left out, obscuring that decision's clear instruction that this evidence of plain intent is *in addition to* the required finding that the "literal meaning . . . lead[s] to absurd results."  *See Crooks*, 282 U.S. at 59-60.

the ensuing years have brought the law of statutory interpretation full circle, restoring the approach traditionally followed by the Supreme Court.  To understand where we are now, it is helpful to first look back to where we were.

As the Supreme Court explained in 1917, "[i]t is elementary that the meaning of a statute must, in the first instance, be sought in the language in which the act is framed, and if that is plain, and if the law is within the constitutional authority of the law-making body which passed it, the sole function of the courts is to enforce it according to its terms."  *Caminetti v. United States*, 242 U.S. 470, 485 (1917) (citations omitted).  The Supreme Court stressed that "[w]here the language is plain and admits of no more than one meaning, the duty of interpretation does not arise, and the rules which are to aid doubtful meanings need no discussion."  *Id*.  Thirteen years later the high court noted it was possible "to override the literal terms of a statute only under rare and exceptional circumstances."  *Crooks*, 282 U.S. at 60.  These circumstances were described as interpretations "leading to absurd results," *id*. at 59, and the Supreme Court stressed that "to justify a departure from the letter of the law upon that ground, the absurdity must be so gross as to shock the general moral or common sense."  *Id*. at 60 (citing *Pirie v. Chicago Title & Trust Co.*, 182 U.S. 438, 451-52 (1901)).

A decade later, a narrow 5-4 majority expanded the grounds for departing from the plain meaning of statutes, beyond avoiding absurd results to avoiding "merely an unreasonable one 'plainly at variance with the policy of the legislation as a whole.'"  *United States v. American Trucking Ass'ns, Inc.*, 310 U.S. 534, 543 (1940) (internal footnote omitted).  This "purpose" based approach could call upon "aid to construction of the meaning of words," as the Supreme Court felt "there certainly can be no 'rule of law' which forbids its use, however clear the words may appear on 'superficial examination.'"  *Id*. at 543-44 (internal footnotes omitted).  For more than thirty-five years, this approach would be followed by the Supreme Court, *see Train v. Colo. Pub. Interest Research Grp., Inc.*, 426 U.S. 1, 9-10 (1976), and the mutual predecessor of our court and of the Federal Circuit followed suit.  *See Ocean Drilling & Exploration Co. v. United States*, 220 Ct. Cl. 395, 402-03 (1979).

The seeds for a shift back to the traditional approach to statutory interpretation were planted in the Supreme Court's controversial 1978 opinion *TVA v. Hill*, 437 U.S. 153 (1978).  In response to the dissenting opinion's criticism of the "absurd result" of the majority's interpretation, *see id*. at 204-05 (Powell, J., dissenting), the Supreme Court majority invoked *Crooks* for the proposition that the departure from plain text applies "only in 'rare and exceptional circumstances'" and requires the plain intent to depart to be clear.  *Id*. at 187-88 n.33.  Although the quote from *Crooks* omitted the actual description of these exceptional circumstances, obscuring whether the high court was restoring the absurd results standard at that time, from this footnote grew the line of cases which allows legislative history to alter the plain meaning of statutes only in "'rare and exceptional circumstances,'" and upon "only the most extraordinary showing of contrary intentions."  *Garcia*, 469 U.S. at 75 (quoting *Hill*, 437 U.S. at 187-88 n.33, in turn quoting *Crooks*, 282 U.S. at 60).  Most of these cases rely on a passage from *Rubin v. United States*, 449 U.S. 424, 430 (1981), which quotes the *Hill* opinion's quote from *Crooks*, or they rely on *United States v. James*, 478 U.S. 597, 606 (1986), which in turn quotes

this *Rubin* passage.  *See, e.g.*, *Ardestani v. INS*, 502 U.S. 129, 135-36 (1991) (quoting *Rubin*); *Burlington N. R.R. v. Okla. Tax Comm'n*, 481 U.S. 454, 461 (1987) (quoting *Rubin*); *INS v. Cardoza-Fonseca*, 480 U.S. 421, 432 n.12 (1987) (citing *James*).[38]

      In these cases, the Supreme Court never found sufficient grounds to depart from the plain meaning of the statutory text, so what constituted "rare and exceptional circumstances" was left undetermined.  *See Ardestani*, 502 U.S. at 136; *Burlington N. R.R.*, 481 U.S. at 461; *Cardoza-Fonseca*, 480 U.S. at 432 n.12; *James*, 478 U.S. at 606; *Garcia*, 469 U.S. at 75; *Rubin*, 449 U.S. at 424; *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 116 (1980); *Hill*, 437 U.S. at 193.  But in a concurrence during his first term on the high court, Justice Scalia criticized this approach as "an ill-advised deviation from the venerable principle that if the language of a statute is clear, that language must be given effect--at least in the absence of a patent absurdity."  *Cardoza-Fonseca*, 480 U.S. at 452 (Scalia, J. concurring in the judgment) (citing, *inter alia*, *Caminetti*, 242 U.S. at 485).  The Supreme Court continued to move back toward the traditional approach to statutory interpretation, and two years later, in a narrow 5-4 decision, announced:

> The task of resolving the dispute over the meaning of [the statute] begins where all such inquiries must begin: with the language of the statute itself. . . .  In this case it is also where the inquiry should end, for where, as here, the statute's language is plain, 'the sole function of the courts is to enforce it according to its terms.'

*United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989) (quoting *Caminetti*, 242 U.S. at 485).   Although the Supreme Court found the intent of Congress to be expressed with "sufficient precision" in the statutory language "so that reference to legislative history . . . is hardly necessary," *id.*, it muddied the waters by reviewing this history to ensure that a literal application of the law would not "'produce a result demonstrably at odds with the intentions of its drafters.'"  *Id.* at 242 (quoting *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 571 (1982)).  Nothing was identified in the legislative history to undermine the plain meaning of the law in question.  *Id.* at 243 & n.6.

      The Supreme Court's trek back to the traditional approach to statutory interpretation was completed in 1992 --- more than two years after the *Glaxo* decision --- with the five-Justice majority opinion in *Connecticut National Bank v. Germain*, 503 U.S. 249 (1992).  In this opinion, Justice Thomas wrote that the "cardinal canon" of construction was "that courts must presume that a legislature says in a statute what it means and means in a statute what it says there."  *Id.* at 253-54 (citing, *inter alia*, *Ron Pair Enters.*, 489 U.S. at 241-42).  The high court explained, "[w]hen the words of a statute are unambiguous, then, this first canon is also the last: 'judicial inquiry is complete.'"  *Id.* at 254 (quoting *Rubin*, 449 U.S. at 430).  The Supreme Court refused to consider the proffered legislative history, *see id.*, and the "rare and exceptional

---

[38]  The Federal Circuit's opinion in *Glaxo* directly relies on *James* and *Garcia* from this line of cases.  *See Glaxo*, 894 F.2d at 395-96.

circumstances" exception was dropped from the *Rubin* quote.  *Cf. Rubin*, 449 U.S. at 430 (stating "judicial inquiry is complete, except in rare and exceptional circumstances") (internal quotations and citations omitted).  Seven years later, in a unanimous opinion, the Supreme Court reaffirmed that "in any case of statutory construction, our analysis begins with 'the language of the statute,'" and that "where the statutory language provides a clear answer, it ends there as well."  *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 438 (1999) (citations omitted).

The Supreme Court has continued to follow this approach, finding that plain and unambiguous statutory text must be applied according to its terms, without review of legislative history.  *See, e.g., Carcieri v. Salazar*, 555 U.S. 379, 387, 391-93 (2009); *Jimenez v. Quarterman*, 555 U.S. 113, 118 (2009); *BedRoc Ltd. v. United States*, 541 U.S. 176, 183, 186 (2004) (plurality opn.) (finding because text was clear court had "no occasion to resort to legislative history"); *id.* at 187 n.8 (affirming "longstanding precedents that permit resort to legislative history only when necessary to interpret ambiguous statutory text"); *Harris Trust & Sav. Bank v. Salomon Smith Barney Inc.*, 530 U.S. 238, 254 (2000).  The only exception that is recognized, consistent with *Crooks*, is when the plain language would lead to a "disposition" that is "absurd."  *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000); *see also Dodd v. United States*, 545 U.S. 353, 359 (2005) ("The disposition required by the text here, though strict, is not absurd."); *Lamie v. United States Trustee*, 540 U.S. 526, 534, 536, 538 (2004).

From the foregoing, it can be seen that under the prevailing Supreme Court doctrine the only "rare and exceptional circumstances" justifying a review of legislative history in the face of plain and unambiguous statutory text fall somewhere between "never" and when a plain reading would result in the absurd.  This would be enough to show that under *Glaxo*, which relies on the Supreme Court's "rare and exceptional circumstances" standard, *see Glaxo*, 894 F.2d at 395 (quoting *James* quoting *Rubin*), only the prospect of an absurd result could prompt a court to consider the legislative history where, as here, the language is plain and clear.[39]  But the Federal Circuit itself has explicitly moved in step with the Supreme Court on this topic.

Thus, last year the Circuit stated that "[w]hen a statute's language is plain, our sole function is to enforce the statute according to its terms," and explained:  "While our decisions recognize that legislative history can shed light on congressional intent, we have never held that legislative history trumps clear text."  *Henry E. & Nancy Horton Bartels Trust for the Benefit of Cornell Univ. v. United States*, 617 F.3d 1357, 1361 (Fed. Cir. 2010) ("*Bartels Trust*") (citing, *inter alia, Glaxo¸* 894 F.2d at 396).  Echoing the Supreme Court, the Federal Circuit noted it "must presume that Congress says in [a] statute what it means and means in a statute what it says," *id.* (citing *Conn. Nat'l Bank*, 503 U.S. at 254), and concluded that its "inquiry thus begins and ends with what [the statute] does (and does not) say."  *Id.*; *see also Novo Nordisk A/S v. Caraco Pharm. Labs., Ltd.*, 601 F.3d 1359, 1364 (Fed. Cir. 2010) ("If the statutory language is unambiguous, the inquiry ends."); *White v. United States*, 543 F.3d 1330, 1337 (Fed. Cir. 2008)

---

[39]  The Court notes that in *Glaxo*, the government argued "that applying the plain meaning of" the relevant statute "will create absurd results."  *Glaxo*, 894 F.2d at 396.

(rejecting government argument that legislative history should be followed rather than plain language of a statute, as "lack[ing] merit" because "it is a bedrock canon of statutory construction that our judicial inquiry ends where statutory language is plain and unambiguous"); *Electrolux Holdings, Inc. v. United States*, 491 F.3d 1327, 1330 (Fed. Cir. 2007) ("The plain meaning is conclusive, and it is erroneous to explore the legislative history in pursuit of alternative meanings.").[40]  The government does not argue that it would be absurd for our general bid protest jurisdiction to extend over task order protests, and the Court agrees with the *MED Trends* opinion's conclusion that this "would not be an absurd result."  *MED Trends*, 2011 WL 4037418, at *5.

Moreover, a look at the legislative history the government urges upon us underscores the problems with the use of such substitutes for the clear meaning of statutory language.  The language the Court must apply is the relatively simple phrase "[t]his subsection shall be in effect for three years."  41 U.S.C.A. § 4106(f).  Although "subsection" is a term of art, as we have seen its meaning is clear.  The relevant provision really needs no interpreting or construing at all, unlike, say, a law using commonly understood words but in a specific, real world context.  But defendant would have the Court determine that the real purpose of the relevant provision was not to do what the provision says --- to sunset a subsection of a law --- but rather to sunset smaller, discrete portions of the subsection.  Its support is language from the conference report, H.R. Rep. No. 110-477, at 956 (2007) (Conf. Rep.), which was reprinted in the Congressional Record and the government's appendix.  *See* App. to Def.'s Help Desk Br. at 40 (containing 153 Cong. Rec. H14929 (daily ed. Dec. 6, 2007)).  The report explained that the Senate amendment to the initial House bill added a provision that among other things would "authorize bid protests for task or delivery orders in excess of $5.0 million under such contracts"; and that the House receded with an amendment expanding this provision beyond defense agencies, which would "raise the threshold for bid protests to $10.0 million and sunset the authorization for bid protests after 3 years."  *Id*.  The report further explained that "[t]he conferees expect that the sunset date will provide Congress with an opportunity to review the implementation of the provision and make any necessary adjustments."  *Id*.

The government contends that this language "clearly demonstrates that Congress did not intend for the sunset to expand th[e] scope of this Court's jurisdiction."  Def.'s Help Desk Br. at 9.  But the conference report language is not unambiguous --- there is no mention of protests being confined to the GAO, nor any indication that task order bid protests had been, and were to continue to be, authorized based on criteria other than size.  The sunsetting of "the authorization for bid protests" could have meant "the GAO's exclusive authorization," opening up protests in

---

[40]  In *Novo Nordisk A/S*, the Circuit left open the possibility that a court "*may* 'look at the legislative history 'only to determine whether a clear intent contrary to the plain meaning exists.'"  601 F.3d at 1364 (emphasis added) (quoting *Sharp v. United States*, 580 F.3d 1234, 1238 (Fed. Cir. 2009) (quoting *Glaxo*, 894 F.2d at 396)).  In light of the Supreme Court precedents detailed above, and the more recent *Bartels Trust* opinion, the Court assumes this option should be followed only to avoid absurd results.

our forum. And even if the language were clear and unambiguous, so, too, is the statutory language. If one or the other must be wrong, on what basis can a court determine that Congress was careless in writing the actual text of the law that it passed and delivered for the President's signature, rather than in drafting summary report language that on its face omits essential details? *Cf. Cardoza-Fonseca*, 480 U.S. at 453 (Scalia, J., concurring in the judgment) ("Where the language of those laws is clear, we are not free to replace it with an unenacted legislative intent.").

Defendant points to other materials that do not and cannot even reflect the intent of the 110th Congress. First, there is the text of two bills currently pending in the 112th Congress (H.R. 899 and S. 498) which would change the sunset provision to read: "Paragraph (1)(B) and paragraph (2) of this subsection shall not be in effect after September 30, 2016." *See* App. to Def.'s Help Desk Br. at 45, 47. Although reported out of their respective committees on March 17 and May 9 of this year, *see id.* at 47, 41, neither bill has yet passed either chamber. The report from the Senate Committee on Homeland Security and Governmental Affairs is also included in the government's appendix, to demonstrate that members of the current Congress believe that under the sunset passed by the 110th Congress the option faced this year was "whether to extend, or let expire, the authority" of the GAO to hear task order protests exceeding $10 million. *See* Def.'s Help Desk Br. at 9; App. to *id.* at 42 (S. Rep. No. 112-16, at 3 (2011)). But while this language shows that a committee of the current Congress thinks an amendment to 41 U.S.C. § 4106(f) is necessary to "reauthorize GAO's expanded jurisdiction for another five years," App. to Def.'s Help Desk Br. at 42, in a report that contains no reference to our court, *see id.* at 41-46,[41] "the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one." *GTE Sylvania*, 447 U.S. at 117-18 (internal quotation and citations omitted). And while "'[s]ubsequent legislation declaring the intent of an earlier statute is entitled to great weight in statutory construction,'" the Supreme Court has warned that "[a] mere statement in a conference report of such legislation as to what the Committee believes an earlier statute meant is obviously less weighty." *Id.* at 118 n. 13 (quoting *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 380-81 (1969)).

Here, the intervening 111th Congress passed two acts within one week, which were signed by the President within a span of three days, concerning the FASA sunset language.[42] In one, the provision relating to defense contracts was changed to sunset in 2016 the subparagraph authorizing task order protests exceeding $10 million, and the GAO's exclusive authority over them. 10 U.S.C. § 2304c(e)(3) (Supp. IV 2011). In the other, Congress expressly stated its re-codification of title 41 was intended to conform to the original intent of the enacting Congresses,

---

[41] Since FASA was passed two years before the ADRA expressly extended our court's injunctive power to post-award bid protests, we would have had little occasion to hear task order protests at the time of passage of the former and naturally would not figure prominently in a background discussion concerning amendments to FASA.

[42] *See* n.36 *supra* and accompanying text.

with corrections to address ambiguities, *see* Pub. L. No. 111-350, § 2(b), 124 Stat. at 3677, and its only change to the FASA sunset was the housekeeping insertion of the actual date of passage. *See* 41 U.S.C.A. § 4106(f)(3); 41 U.S.C. § 253j(e)(3) (Supp. III 2010). These official actions speak louder than any words in a committee report. Congress knows how to write a sunset provision targeting only the GAO's expanded protest authority, and chose not to use this language when it corrected title 41 --- retaining a clause which sunset the entire subsection which limited protests of civilian agencies' task orders. *See MED Trends*, 2011 WL 4037418, at *5.[43]

The Court concludes that the sunset clause of 41 U.S.C.A. § 4106(f)(3) rendered the entire subsection (f) ineffective on May 27, 2011. Accordingly, the government's motion to dismiss the Help Desk Solicitation claim is DENIED. As discussed above, the Court has determined that this aspect of MORI's protest is not connected to the issuance or proposed issuance of a task order and has not been waived; and even if it were considered to be so connected to a task order, 41 U.S.C. § 4106(f) no longer limits our court's jurisdiction in this area.

### 3. Standing

Before the Court may turn to the merits, the issue of prejudice must first, however, be considered in the context of standing. *See Info. Tech.*, 316 F.3d at 1319. In bid protests, prejudice "is a necessary element of standing," and in all cases "standing is a threshold jurisdictional issue." *Myers Investigative & Sec. Servs., Inc. v. United States*, 275 F.3d 1366, 1369-70 (Fed. Cir. 2002); *see also Labatt Food Serv., Inc. v. United States*, 577 F.3d 1375, 1378-79 (Fed. Cir. 2009). As noted above, an "interested party" with standing to sue under the ADRA, 28 U.S.C. § 1491(b)(1), has been defined as an actual or prospective offeror "whose direct economic interest would be affected by the award of the contract or by failure to award the contract." *Am. Fed'n of Gov't Employees,* 258 F.3d at 1302. And the requisite "direct economic interest" for a pre-award protest such as this one is the infliction of "a non-trivial competitive injury which can be redressed by judicial relief." *Weeks Marine,* 575 F.3d at 1363.

The issue of MORI's standing is not raised directly by the government, but is instead addressed obliquely. The government quotes dicta from the Federal Circuit's *Galen Medical*

---

[43] The government also notes that the Department of Defense ("DoD"), General Services Administration, and National Aeronautics and Space Administration("NASA"), when issuing the interim rule concerning the new sunset date for defense task order protests, expressed the belief that because the sunset for civilian agencies was not extended "contractors will no longer be able to protest task or delivery orders awarded by agencies other than DoD, NASA, and the Coast Guard." Def.'s Supp'l Br. II at 3 (quoting 76 Fed. Reg. 39,239 (July 5, 2011). This statement is wrong on its face, as even under the government's interpretation protests may still be based "on the ground that the order increases the scope, period, or maximum value of the contract," 41 U.S.C.A. § 4106(f)(1)(A), and in any event sheds no light on the intentions of the 110th Congress.

*Associates* opinion, which ultimately quotes dicta from the Court of Claims' opinion in *Keco Industries*, stating "'[n]ot every regulation is established for the benefit of bidders as a class, and still fewer may create enforceable rights.'" Def.'s Cancel'n Reply at 5-6 (quoting *Galen Med. Assocs.*, 369 F.3d at 1330 (quoting *Keco Indus., Inc. v. United States*, 203 Ct. Cl. 566, 578 (1974)); Def.'s Supp'l Br. I at 4 (same). This dicta is cited in arguments attempting to show that violations of, *inter alia*, FAR sections 1.602-2(b) and 3.101-1 cannot be the grounds for a bid protest. In this same context the government makes a passing reference to the opinion in *Hallmark-Phoenix 3, LLC v. United States*, 99 Fed. Cl. 65, 71-72 (2011), concerning the "prudential standing requirement for contractors." Def.'s Supp'l Br. I at 4 (citing *Hallmark-Phoenix*). A longer discussion of this opinion and its "zone of interests" analysis is found in an argument concerning FAR section 7.302, *see* Def.'s Cancel'n Reply at 6-8 --- a provision which the Court has found to not supply the basis for bid protest jurisdiction.

In any event, if these arguments of the government are construed as challenges to plaintiff's standing, the Court does not find them persuasive. The *Keco Industries* dicta was limited to circumstances in which the violation of a regulation concerned the selection of an awardee and not the treatment of the protester's offer. *See Keco Indus., Inc. v. United States*, 203 Ct. Cl. 566, 578 & n.7 (1974). The Federal Circuit has held that the "zone of interests" standard did not apply to bid protests brought as a breach of the duty to fairly and honestly consider bids, *CACI, Inc.-Fed. v. United States*, 719 F.2d 1567, 1574 (Fed. Cir. 1983), and thus it should be no bar to our jurisdiction in a case such as this. *See Res. Conserv'n Grp.*, 597 F.3d at 1243 (finding that the ADRA provided our court with jurisdiction over "the full range of procurement protest cases previously subject to review in the federal district courts and" our court (quotation omitted)). Moreover, Congress's use of the modifier "any" in the ADRA, so that we have jurisdiction over interested parties' objections to "*any* alleged violation of statute or regulation in connection with a procurement," 28 U.S.C. § 1491(b)(1) (emphasis added), expands standing beyond the zone-of-interests test. *See Bennett v. Spear*, 520 U.S. 154, 164-66 (1997). And even if the test did apply, it is hard to see how the obligations to "[e]nsure that contractors receive impartial, fair, and equitable treatment," 48 C.F.R. § 1.602-2(b), and to conduct business "with complete impartiality and with preferential treatment for none," 48 C.F.R. § 3.101-1, would not have been intended to protect the interests of offerors.[44]

Clearly, MORI --- whose offer was in the competitive range for the cancelled procurement, Compl. ¶ 123 --- has alleged that "non-trivial competitive injury" had been suffered due to the cancellation and the decision to procure help desk services through a vehicle that excluded its participation. By these actions, plaintiff was "deprived of the opportunity to compete for the provision of" the services that were sought in the cancelled procurement. *Distributed Solutions*, 539 F.3d at 1345 (finding that loss of "the opportunity to compete" affected potential offerors' direct economic interest).

---

[44] No suggestion has been made that the Rule of Two for setting aside contracts for small businesses, 48 C.F.R. § 19.502-2(b), is not intended to further the interests of small businesses.

**C.  Was the Decision to Cancel the Solicitation Arbitrary and Capricious?**

Plaintiff moves for judgment on the administrative record, arguing that the cancellation decision lacks a rational basis.  MORI contends that the administrative record fails to support the agency's claim that its needs for contractor-provided IT support have changed due to an increase in employees authorized to work in the IT area.  *See* Pl.'s Cancel'n Br. at 11-12, 25-27; Pl.'s Cancel'n Reply at 13-15 & n.7, 19.  Plaintiff also argues that the cancellation decision rested on cost savings calculations that were arbitrary and erroneous, and which failed to follow the OMB Circular A-76 methodology.  Pl.'s Cancel'n Br. at 5-10, 13-14, 24-32; Pl.'s Cancel'n Reply at 15-20.  MORI also alleges that the cancellation of the procurement, since it lacked a valid reason, must have been a pretext to avoid awarding MORI a contract --- in light of the numerous protests, including among other things procurement integrity issues, which had not been resolved but only delayed by a series of purported corrective actions.  Pl.'s Cancel'n Br. at 33-36; Pl.'s Cancel'n Reply at 21-22.  And it contends that the cost comparison spreadsheet created by Mr. Karimian was so grossly erroneous as to imply bad faith on the part of the agency.  Pl.'s Cancel'n Br. at 2, 36-37; Pl.'s Cancel'n Reply at 21-22.

In its cross-motion the government notes that changes in the needs of agencies have been found to be rational grounds for cancelling procurements, and that the FAR requires that solicitations at least be amended in such circumstances.  Def.'s Cancel'n Br. at 18-19 (citing, *inter alia*, *Am. Gen. Leasing, Inc. v. United States*, 218 Ct. Cl. 367, 375 (1978); *Madison Servs.*, 92 Fed. Cl. at 124-28; *Aviation Enters.*, 8 Cl. Ct. at 19; 48 C.F.R. § 15.206(a), (e)).  Defendant contends that the memorandum from Dr. Rodgers stating that NIDDK's needs have changed is sufficient to establish the rationality of the decision, since as its director "he would obviously possess knowledge about the agency and its employees."  Def.'s Cancel'n Br. at 20.  As additional support, the government points to the evidence that funding to hire additional employees was approved in August 2009.  Def.'s Cancel'n Reply at 8 (citing AR at 69, 78).  The government argues that the cost saving chart is irrelevant to the cancellation decision, as it was prepared over a year earlier, before the agency sought to expand the number of NIDDK employees in the IT area --- and it was the resulting increase in employees that prompted the cancellation.  Def.'s Cancel'n Br. at 20-22; Def.'s Cancel'n Reply at 9-10.  Moreover, defendant contends that the methodology of OMB Circular A-76 cannot be court-enforced (a position with which the Court agrees, in this particular context), and that the approach used was rational.  Def.'s Cancel'n Br. at 22-23; Def.'s Cancel'n Reply at 9-10.  And finally, the government argues that there is no evidence of bad faith on the agency's part --- let alone clear and convincing evidence[45] --- and that the timing of the cancellation decision demonstrates that it was based on

---

[45]  The Court has conclusively demonstrated that the notion that a heightened level of proof is needed to overcome the presumption of good faith conduct (on the part of federal employees) has long rested on misstatements, dicta, and distortions of precedent and not on reasoning consistent with the rule of law.  *See Tecom, Inc. v. United States*, 66 Fed. Cl. 736, 757-69 (2005).  Nevertheless, the Court also recognizes it is bound by precedent applying the clear and

changes in the number of NIDDK employees, not on a desire to injure plaintiff.  Def.'s Cancel'n Br. at 23-24; Def.'s Cancel'n Reply at 11-12.

As the government explains things, the cancellation decision was simply a case of a buyer changing its mind about what it needed to procure.  But, as the Court explained in part II.B.1.a of this opinion, once offerors have submitted proposals, the fair treatment owed them under 48 C.F.R. § 1.602-2(b) includes a prohibition against the arbitrary cancellation of solicitations.  Although government agencies might more or less (depending on whether Congress has imposed its own limitations) be said to have broad discretion in determining their needs, once the rights of offerors are implicated these decisions must be rational.  For a cancellation decision to be found not to be arbitrary and capricious, the agency must have "examine[d] the relevant data and articulate[d] a satisfactory explanation," *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43; this explanation must be "coherent and reasonable," *Domenico Garufi*, 238 F.3d at 1333 (quotation omitted); and it must not "'entirely fail[] to consider an important aspect of the problem'" or "'run[] counter to the evidence before the agency.'"  *Ala. Aircraft*, 586 F.3d at 1375 (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43).  The Court concludes that NIDDK's cancellation of the IT Services Solicitation fails this test.

Plaintiff is right in contending that the situation presented in this case is not at all similar to those in which solicitations have been cancelled because the procuring agency decided to change the specifications for items it sought to obtain, *cf. Am. Gen. Leasing, Inc. v. United States*, 218 Ct. Cl. 367, 375 (1978) (concerning a revision in specifications for leased computer hardware); *Aviation Enters.*, 8 Cl. Ct. at 19 (concerning "overstated specifications" for leased aircraft); or was issuing a new solicitation to reflect programmatic changes in the scope of services sought.  *Cf. Madison Servs.*, 92 Fed. Cl. at 127 (concerning a new solicitation that would be suitable for a broader range of offerors).  The agency has not articulated a change in its demand for IT services.  Rather, NIDDK maintains that --- except for Help Desk services and, possibly, health informatics and work to be identified in the future, *see* AR at 3-5 --- it had projected that by the end of 2010 it would "have sufficient staff in order to perform" a number of IT "functions with Federal employees."  AR at 3, 5.  These functions were identified as "application development, database administration, network administration, systems security, and systems administration."  AR at 3 (Rodgers Mem.); *see also* AR at 5 (Miller Mem.).

Defendant argues that because the agency first allegedly hired (or planned to hire) the additional IT employees who would be available to perform the identified functions, and then made the formal decision to cancel the procurement, the fact of the hiring makes the cancellation rational regardless of the reasoning supporting the first step.  *See* Def.'s Cancel'n Br. at 20-22; Def.'s Cancel'n Reply at 9-10.  But this is not like, for instance, cancelling a solicitation seeking office supplies after stumbling across a forgotten stockpile of these supplies obtained in a previous procurement --- in which case the costs of the stockpile have already been incurred.

---

convincing evidence standard in the context of bid protests.  *See Galen Med. Assocs.*, 369 F.3d at 1330, 1337-40.

The costs of IT services to be received in the future have yet to be incurred.  And the agency has decided to "convert[] contract support positions to Federal employees" not just because employees were available, but because "[a]n analysis of expenditures showed that NIDDK could realize significant savings" by doing so.  AR at 3 (Rodgers Mem.).  This was the reason given by the client agency to the NIH contracting officer, who noted in her approval memorandum that "an analysis reveals/projects that NIDDK could realize a minimum savings of $860,988.21 annually [i]f it converted at least 11 of its contract support positions to Federal employees."  AR at 5 (Miller Mem.).  The government does not suggest that the IT Services Solicitation would have been cancelled if the agency believed that costs would significantly increase by using federal employees to perform the functions.  Such a decision would hardly be rational.  The cost savings rationale cannot be divorced from the decision to cancel the procurement.

But even apart from the cost savings rationale, the Court finds the cancellation decision arbitrary, as the agency failed to consider relevant information, ignored an important aspect of the procurement, and lacked record support for its conclusions.  Now, what is important to be considered in making a procurement decision will vary from case to case --- a consideration could be mandated by Congress or by an Executive branch regulation, or it may be apparent from the circumstances of the procurement.  Here, the administrative record shows that a memorandum from the President dated March 4, 2009 was the inspiration for NIDDK's review of "its balance of insourcing and outsourcing in the information technology area."  AR at 3 (Rodgers Mem.).  But by that time, MORI had filed its second GAO protest challenging a contract award to ATC --- a protest that included claims of bias and wrongdoing on the part of Mr. Karimian.  *See* Compl. ¶¶ 15-16, 124, 132.  The allegations concerning Mr. Karimian had already become the subject of an HHS OIG investigation, launched in January 2009, *see id.* ¶ 17, and in order to secure the dismissal of MORI's second GAO protest the agency apparently pledged, on January 22, 2009, to exclude Mr. Karimian from further involvement with the procurement.  *See id.* ¶ 21(g); App. to Def.'s Mot. Dismiss at 2, ¶ 4 (current contracting officer noting that "[i]n January 2009, NIDDK elected to pursue corrective action to replace the project officer").

Despite the chief information officer's conduct in the IT services procurement being the subject of an open OIG investigation, and despite his being relieved of responsibilities in the procurement due to alleged PIA violations, the NIDDK director apparently asked Mr. Karimian to analyze whether the agency would save money by cancelling the procurement and then relied on his analysis.  *See* AR at 3-4, 6, 10; Def.'s Cancel'n Reply at 10; Def.'s Resp. to Pl.'s Mot. Supp. Admin. R. at 4, 7.  The administrative record does not contain any evidence that the director considered the possibility that Mr. Karimian would have an interest in seeing the procurement cancelled, as a means of mooting the investigation into the latter's alleged PIA violations.[46]  Curiously, before the HHS OIG could complete its investigation into whether Mr. Karimian had improperly assisted ATC, the agency made a third attempted award to ATC,

---

[46]   The government takes the position that the cancellation mooted all of MORI's claims, including the alleged PIA violations.  *See* Def.'s Supp'l Mot. Dismiss at 6.

precipitating MORI's third GAO protest, filed September 2, 2009. *See* Compl. ¶¶ 23-24. In this protest, the agency was made aware of additional details concerning the alleged PIA violations. MORI has alleged that, among other things, Mr. Karimian helped ATC draft its proposal by giving it a confidential proposal from a contractor that he had supervised at another agency and by introducing its president to a leading expert in a discipline that was to be added to the solicitation requirements; and that Mr. Karimian altered the requirements to suit an ATC subcontractor. *See id.* ¶¶ 24(a), 55, 56, 58. The agency responded with proposed corrective action that included suspending the procurement while its counsel conducted his own investigation into the PIA allegations. *Id.* at ¶¶ 27, 29; App. to Def.'s Mot. Dismiss at 6-7. As a consequence, the third protest was dismissed. Compl. ¶ 31.

Agency counsel recognized that the PIA allegations were "supported by credible evidence" and "concern[ed] the purported improper conduct of a Government official that might have had a bearing on the integrity of the procurement process, the Agency's consideration of proposals, and the ultimate source selection," App. to Def.'s Mot. Dismiss at 7 n.1, and that the investigation involved "a critical issue." *Id.* at 8. After a fourth GAO protest was filed by MORI on March 23, 2010, adding to its complaints the lack of resolution of the PIA matter, agency counsel informed the GAO that the OIG investigation had found no violations, and that his investigation yielded the same determination. *See* Compl. ¶¶ 36-38. MORI then brought its protest, including the alleged PIA violations, to our court. In response, the government argued that a challenge to its proposed corrective action was premature --- contending that although the agency *counsel's* investigation was complete, the *agency* had yet to determine whether PIA violations affecting the procurement were committed. *See* Def.'s Mot. Dismiss at 4-5 & n.4; App. to *id.* at 3-4 (Miller Decl., ¶ 8) (contracting officer stating she still "ha[d] to make a determination regarding whether a Procurement Integrity Act violation had an impact upon the procurement" and had to provide this "determination to the Head of Contracting Activity who will make the final determination"); Def.'s Reply to Pl.'s Resp. to Def.'s Mot. Dismiss at 17; Tr. (June 29, 2010) at 52. This is how matters stood as of November 23, 2010, when the contracting officer approved the agency's request to cancel the IT Services Solicitation --- following the analysis of an individual against whom a PIA investigation was still pending, and whose conduct was the basis of claimed PIA violations being entertained in our court.[47] *See* AR at 3-6, 10; Def.'s Cancel'n Reply at 10.

The agency's reliance upon Mr. Karimian is all the more troubling when one considers the factual and analytical gaps found in the administrative record. First, there is no support for the "projecti[on]" that the agency would by the end of 2010 "have sufficient staff in order to perform" several functions that might have been assigned to the IT Services Solicitation. AR at 3 (Rodgers Mem.). The government's argument that Dr. Rodgers "obviously" knew "about the

---

[47] The agency apparently dropped its PIA investigation once the procurement was cancelled. Pl.'s Cancel'n Br. at 35 n.12 (MORI proffering that the agency informed it this year "that the Contracting Officer did not make a determination or forward a determination to the HCA and did not intend to address the issue after the cancellation").

agency and its employees," Def.'s Cancel'n Br. at 20, is nothing more than speculation.  The administrative record indicates that the agency had more than 600 employees in 2009, *see* AR at 73, and contains nothing to support the inference that Dr. Rodgers had particular knowledge concerning its IT staff.  Of course, there is nothing wrong with an agency decision maker relying on his own knowledge, and when such information is not part of the paper record supplementation may be allowed.  *See Tauri Grp., LLC v. United States*, 99 Fed. Cl. 475, 481 (2011); *Beta Analytics Int'l, Inc. v. United States*, 61 Fed. Cl. 223, 225 (2004); *Orion Int'l Techs. v. United States*, 60 Fed. Cl. 338, 343-44 (2004).  The government could have sought a remand or leave to supplement the administrative record with a more complete explanation of the agency's reasoning, but decided against these courses of action.  *See* Def.'s Resp. to Pl.'s Mot. Supp. Admin. R. at 1 n.1; Sched. Order (Mar. 4, 2011) at 1 (providing that the government "may file its own motion relating to the treatment of the administrative record").

Because of plaintiff's motions to supplement the administrative record, we know that the cancelled IT Services Solicitation involved thirty-three positions.[48]  *See* AR at 80, 85 (derived by dividing the total labor hours by 1,880).  The administrative record contains nothing, other than the director's conclusory statement, *see* AR at 3 (Rodgers Mem.), showing that the agency could have sufficient IT employees to staff the non-Help Desk positions --- which may have totaled as many as twenty-four.[49]  The record contains job descriptions for six positions (five at grade GS-13 and one at GS-12) in the agency's Computer Technology Branch, *see* AR at 18-45, the director of which is Mr. Karimian.  *See* AR at 10.  When the government submitted these descriptions to supplement the administrative record, it described them as documents "NIDDK reviewed when creating the cost comparison chart and deciding the type of personnel it would seek to hire."  Def.'s Resp. to Pl.'s Mot. Supp. Admin. R. at 3.  While these job descriptions support the reasonableness of using GS-13 pay rates in the cost comparison spreadsheet prepared by Mr. Karimian, nothing in the record indicates how many of them were filled and available to perform requirements of the IT Services Solicitation.

The emails and accompanying attachments concerning the agency's requested increase in FTEs also fail to support the conclusion that NIDDK projected hiring a sufficient number of IT employees to perform the non-Help Desk portions of the cancelled IT Services Solicitation.  *See* AR at 59-79.  These documents indicate that in August 2009, NIDDK requested an increase of twenty-five FTEs (from 630 to 655) for fiscal year 2010, including five "in order to in-source Information technology activities which are now being performed by contractor outsourcing" ---

---

[48]  The government did not include a copy of the IT Services Solicitation in the administrative record of its cancellation, and thus apparently did not consider its requirements when making the decision to cancel.

[49]  The MORI pricing proposal shows ten positions connected with Help Desk services --- a "Help Desk Manager," two positions under "Network Administrator/Help Desk Tier 2," and seven positions under "Help Desk Tier 2."  *See* AR at 80, 85.  Plaintiff claims there were nine, counting only one of the positions in the second category.  Pl.'s Help Desk Br. at 13.

although one of the five is to "provide support for essential new IT initiatives."  AR at 73.  An additional eleven FTEs above the budgeted amount (from 649 to 660) were requested for fiscal year 2011, including five to insource IT activities.  *Id.*  The numbers apparently approved by NIH were 643 FTEs for fiscal year 2010 and 655 for fiscal year 2011.  *See* AR at 78-79.  Although these increases were enough to cover the number of IT employees that the agency wished to add, they were less than the agency requested overall --- and the administrative record does not indicate how NIDDK spread its new hires among the areas vying for the new slots, or whether the hiring even occurred.

Moreover, even if all ten newly proposed IT employee positions were authorized and filled, nothing in the record indicates that this would be sufficient to perform all but the Help Desk work under the IT Services Solicitation.  The cancelled solicitation required the full-time work of thirty-three individuals, of whom nine or ten were to perform Help Desk work.  *See* AR at 80, 85.  The Help Desk Solicitation encompassed eleven positions, but each of a part-time nature (980 labor hours).  *See* App. to Def.'s Help Desk Br. at 8.  Even if all of the Help Desk work under the IT Services Solicitation is assumed to be covered by what amounts to about 6 FTEs, there would have remained at least twenty-three positions to be performed under the cancelled solicitation.  The hiring of ten extra IT employees does not on its face appear sufficient to perform all of that work.  Perhaps thirteen of the positions that would have been performed under the cancelled solicitation have been performed by agency employees --- but no evidence in the record supports this.  Nor is it the sort of knowledge likely within the ken of the agency's director, as opposed to, say, within Mr. Karimian's.  In any event, Dr. Rodgers could not have reasonably concluded, based on just the evidence contained in the administrative record, that the agency would hire by the end of 2010 enough IT employees to perform the non-Help Desk portions of the cancelled solicitation.

The above recounted failure to take into account Mr. Karimian's unresolved PIA issues when seeking his advice; failure to consider the full range of work required by the IT Services Solicitation; and absence of record evidence supporting the conclusion that sufficient agency personnel were on staff to perform the non-Help Desk work, are enough to show that the decision to cancel the IT Services Solicitation was arbitrary.  But on top of this, there are the problems with the cost savings analysis upon which the agency's director and the contracting officer relied.  As was noted above, it would hardly be rational for an agency to cancel a procurement on the ground that it would cost the taxpayers *more money* to have the same services performed by government employees.  While there may be non-financial reasons to cancel a particular procurement --- in addition to changes in requirements, these could perhaps include security or timing issues --- none here was given.  The agency's director explained in his cancellation request that "[a]n analysis of expenditures showed that NIDDK could realize significant savings if it converted contract support positions to Federal employees."  AR at 3 (Rodgers Mem.).  He then requested cancellation under the belief that sufficient IT employees would soon be hired to convert the work from the proposed contract positions.  *Id.* at 3-4.  But even if employees were available to perform the work contained in the IT Services Solicitation, assigning them the work in place of other duties would not make sense if the government expected this would cost *more*

than contracting it out.  Thus, in the memorandum approving the request, the contracting officer adds that "an analysis of expenditures reveals/projects that NIDDK could realize a minimum savings of $860,988.21 annually [i]f it converted at least 11 of its contract support positions to Federal employees."  AR at 5 (Miller Mem.).  Without question, the referenced analysis was relied upon by the agency when it decided to cancel the procurement, and the decision to cancel would not be rational if this analysis is found to be arbitrary.

One problem with the cost savings analysis has already been touched upon, as the Court finds it hardly rational for the agency to have requested that Mr. Karimian perform this analysis while his prior involvement with the procurement was the subject of pending allegations of PIA violations.[50]  A second problem with the analysis is that it is based on just eleven IT positions, when the cancelled procurement involved thirty-three positions.  *See* AR at 6 (Spreadsheet), 80, 85.  Even if the agency had already determined that the Help Desk work would still need to be contracted out, this would still leave at least twenty-three other positions to be converted from the IT Services Solicitation.  Even if many of these positions had already been staffed by government employees in the interim while the procurement proceeded, the decision to cancel the solicitation entails a decision to keep that work with government employees instead of using contractor personnel, and cannot rationally ignore the respective costs of performing that work.

Then there are the problems with the analysis itself.  It is based on a purported comparison of seven categories of positions, totaling eleven positions in all.  AR at 6 (Spreadsheet).  The listed positions are: ".Net programmer GS-12/13"; "JAVA/JEE programmer GS-13"; "Database administrator GS-13"; "Infosec/Network engineer GS-13"; "Linux administrator GS-12/13"; "Systems administrator GS12/13"; and "KCMS Administrator."  *Id.* These positions are assigned contractor costs, ranging from $[XXX,XXX] to $[XXX,XXX] annually (for 1,880 hours worked). *Id.*  The spreadsheet does not explain the basis for these numbers.  Included in the administrative record is an e-mail sent by Mr. Karimian on November 18, 2010, with an attachment titled "Voucher 20 period 030109 to 033109.pdf."  AR at 10.  The attachment is the invoice for MORI's support services for the period of March 1, 2009 through March 31, 2009, AR at 12-16, and contains the positions and hourly rates for twenty-one of plaintiff's employees.  *See* AR at 14-15.  In the e-mail, Mr. Karimian wrote, "I used the rates are [sic] based on MORI March 2009 Invoice #20 page 3 and 4 to compare to Federal GSA salary."  AR at 10.  Under this explanation, he listed the following rates:

> .NET Programmer: line 2, $[XXX.XX]
> JAVA Programmer: line 2, $[XXX.XX]
> Database Administrator: line 16, $[XXX.XX]
> Network Engineer: line 1, $[XX.XX]

---

[50]  The Court hastens to add that at this stage of proceedings nothing has been proven concerning Mr. Karimian's alleged prior actions.

Linux Administrator: line 8, $[XXX.XX]
Systems Administrator: Line 20, $[XXX.XX]

*Id.*

As MORI points out, the hourly rates used in the cost comparison spreadsheet are higher than those stated in Mr. Karimian's e-mail for the positions of ".Net Programmer" (actually $[XXX.XX]), "JAVA/JEE Programmer" (actually $[XXX.XX]), and "Infosec/Network engineer" (actually $[XXX.XX]). Pl.'s Cancel'n Br. at 9-10, 28-29.[51]  A fourth position, "KCMS Administrator," was not explained in the e-mail and was given MORI's highest hourly rate of $[XXX.XX]. *See* AR at 6 (Spreadsheet), 10; Pl.'s Cancel'n Br. at 10, 29-30.  The government concedes that "there are admittedly some inconsistencies in the record, *compare* AR6 *with* AR10," Def.'s Cancel'n Br. at 24, but notes that "[t]he numbers contained in the chart, rather than the numbers Mr. Karimian attempted to recall in an email over a year later, are the numbers that he used at the time the chart was created." *Id.* at 21 n.9.  Defendant explained that Mr. Karimian's e-mail was an attempt "to recollect how [his cost comparison] was done," and "is not evidence of what the agency did and not evidence that what the agency did was not rational." Tr. (July 27, 2011) at 159.  The problem for the government is that this e-mail is the *only* attempt in the administrative record to explain the basis for the contractor cost figures used in the spreadsheet.  Without this e-mail, the figures have no basis whatsoever, and even with it, four of the seven are unexplained.  The e-mail at best shows that Mr. Karimian must have performed his calculations no earlier than the April 30, 2009 date that the invoice was forwarded to his attention, *see* AR at 10, and demonstrates the basis for three of the seven contractor cost calculations.

Another aspect of the contractor cost calculations that is left unexplained is why Mr. Karimian was using the rates from MORI's voucher in the first place.  Had the agency followed OMB Circular A-76, it would have either conducted a standard competition, in which contractor costs would be based on their submitted offers, *see* Attach. B to OMB Circular A-76, Part D, ¶ 5, or it would have conducted a streamlined competition, in which contractor costs could rest on either "documented market research or solicit[ed] cost proposals." *Id.*, Part C, ¶ 1(b).  At the time Mr. Karimian created his spreadsheet, to determine the likely contractor costs of performing the requirements of the IT Services Solicitation the agency had at its disposal the proposals submitted by offerors in June 2008, upon which the second award to ATC was made.  *See* Compl. ¶ 21(a), (d).  As it is undisputed that the IT Services Solicitation concerned more positions than MORI's incumbent contract, *see* Tr. (July 27, 2011) at 114 (government counsel explaining increase to 33 positions), there is no obvious, rational reason why someone attempting

---

[51]  Another rate, for "Systems Administrator," is misstated in the e-mail as being $[XXX.XX]. The e-mail cites line 20 of the voucher, which concerned a position that was paid $[XX.XX] per hour, *see* AR at 10, 15 --- which is the figure used in Mr. Karimian's cost comparison spreadsheet.  *See* AR at 6 (Spreadsheet); Pl.'s Cancel'n Br. at 9 n.2, 29 & n.9.

to determine the costs of a contract awarded under the IT Services Solicitation would look to MORI's costs under the incumbent contract.[52]  The administrative record does not contain the director's request for analysis, so we cannot know if Mr. Karimian's mission was to compare the costs of MORI's non-Help Desk IT support under the incumbent contract with the costs of moving that work in-house.[53]  If it was, the wrong question was asked, and the analysis does not support a decision to cancel a different procurement involving more than eleven positions (even after subtracting Help Desk support).  In any event, no reason is given for using MORI's invoice as the source of an estimate of contractor costs under the cancelled procurement.

Finally, there are the unexplained factors employed by Mr. Karimian in calculating the costs if government employees were to fill the positions listed in his spreadsheet.  The spreadsheet calculates the cost of contractor performance based on each employee working 1,880 hours.  *See* AR at 6 (Spreadsheet).  It makes a straight comparison of this to the work performed by one federal government FTE.  *Id.*  But as MORI points out, *see* Pl.'s Cancel'n Br. at 6-7, 30-31, under the cost comparison methodology of the Circular, the government is to assume that one FTE works only 1,776 productive hours annually.  Attach. C to OMB Circular A-76, Part B, ¶ 2(d)(2).  While it might be the case that NIDDK employees take less annual, sick, and administrative leave, and have less training, than the average federal employee, this is nowhere explained in the administrative record.  Mister Karimian then took the GS-13 salaries for steps one, five, and ten, and grossed them up by twenty-seven percent to derive the "Fully Burdened FTE Cost" for each staff position, presumably to reflect fringe benefits and the like.  *See* AR at 6. Plaintiff notes that had the Circular been followed, these salaries would have been increased by "the civilian position full fringe benefit cost factor of 36.25 percent," Attach. C to OMB Circular A-76, Part B, ¶ 2(f)(1), and the resulting figure would have been further increased by a twelve percent "overhead factor."  *Id.*, Part B, ¶ 5; *see* Pl.'s Cancel'n Br. at 6, 30.  Now perhaps there is good reason to believe that NIDDK's employees receive less fringe benefits than other federal workers, or to believe that the agency differs from the rest of the government in having no overhead costs, but no rationale for the twenty-seven percent figure is provided in the administrative record.

The problem with these unexplained factors is not that the agency departed from the approach mandated by OMB Circular A-76, but that no reason is provided for the departures. Had the agency followed the cost comparison method prescribed in the Circular, its approach would have been presumptively proper, following the publicly-decreed policy of the Executive

---

[52]  Perhaps Mr. Karimian was not permitted access to the information in the IT services proposals once he was removed from the procurement due to his alleged PIA violations.  *See* Compl. ¶ 21(g); App. to Def.'s Mot. Dismiss at 2, ¶ 4.  This would be further reason for finding the agency's reliance on him to lack a rational basis.

[53]  The inclusion of costs for a "KCMS Administrator," *see* AR at 6 (Spreadsheet), a position with no known counterpart under the MORI contract, would seem to indicate that this was not his mission.

Office of the President.  Other than by identifying math errors, attempts by plaintiff to impeach the calculations would have smacked of second-guessing.  But NIDDK did not take refuge in this safe harbor.  Without the policy of the Circular to fall back upon to justify its choices, and no internal agency policy identified by the government as their basis, the agency had to provide an explanation for assuming that its employees work 1,880 productive hours, or receive no more than twenty-seven percent of their salaries in fringe benefits (and overhead support).  Requiring such an explanation does not involve second-guessing the judgment of the decision makers, but rather first-guessing --- as we can only guess as to reasons not contained in the administrative record.

Without an explanation for the use of these factors, there is a disconnect between the information considered by the agency and its decision --- with no reason given for processing the information in that way, the result is no better than if the numbers were pulled from a black box. Court review of procurement decisions necessarily "entails identifying the judgments made by the relevant officials and verifying that the relevant information was considered, the relevant factors were employed, and a satisfactory explanation was articulated."  *Fort Carson*, 71 Fed. Cl. at 592 (citing *Overton Park*, 401 U.S. at 416, and *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43). While in certain circumstances and contexts the use of particular factors might be attributed to the knowledge and expertise of the official using them, when there exist baselines for the factors --- such as found in the Circular --- the Court holds that deviations from the norm must be explained, else they are arbitrary.  The mere fact that calculations were performed does not make their results a rational basis for decision making --- if that were the case, then cost savings would be whatever an agency says they are, insulating decisions based on them from court review.

Plaintiff has adequately demonstrated that the agency's arbitrary cost calculations were to its prejudice, ultimately depriving MORI of the opportunity to compete for the provision of the services sought in the cancelled procurement.  In MORI's calculations, after excluding the incongruous KCMS Administrator position from the analysis, it adjusts the government salary figures in the spreadsheet (2009 GS-13 rates for steps one, five, and ten) on the assumption these are based on 1,776 annual productive hours --- increasing them to cover the additional 104 annual hours provided by private sector workers (equivalent to recognizing that 1.06 federal government FTEs are needed to perform the work of one individual under contract).  *See* Ex. 1 to Pl.'s Cancel'n Reply at 2 n.5.  It then applies the 36.25 percent full fringe benefit cost factor, and the twelve percent overhead factor from the Circular's Attachment C.  *Id.*  When the resulting figures are compared to contractor costs that are derived from the hourly rates MORI proposed for the base year of the IT Services Solicitation, which was to begin August 17, 2009, *see* AR at 85, rather than the "minimum savings of $860,988.21" upon which the cancellation decision was based, AR at 5 (Miller Mem.), one finds at best government savings of about $105,000 (using step one salaries) and a worst case scenario of increased costs of nearly $316,000 if the work were insourced (using step 10 salaries).  *See* Ex. 1 to Pl.'s Cancel'n Reply at 1.[54]

---

[54]  Basing the comparison on step five, as required by the Circular, *see* Attach. C to OMB Circular A-76, Part B, ¶ 2(e)(1), the government would lose more than $81,000 by insourcing the

MORI also contends that a cancellation decision made in November 2010 should have been based on calculations using the government salaries in effect in 2010, not the 2009 ones used by Mr. Karimian over one year earlier. *See* Pl.'s Cancel'n Br. at 31-32. The Court agrees that the 2010 salaries were relevant information that should not have been ignored at the time the cancellation decision was made. Plaintiff shows that if the same adjustments described in the preceding paragraph are made to the 2010 salaries, and if these are compared to contractor costs derived from the hourly rates MORI proposed for the period beginning August 17, 2010, *see* AR at 80, the results range from government savings of nearly $117,000 to increased government expenses of nearly $315,000 from insourcing the ten positions. *See* Pl.'s Cancel'n Br. at 28-32; Ex. 1 to *id.* at 1-2. Using the salaries of GS-13 step 5, *see* n.54 *supra*, the agency would spend an additional $75,000 by insourcing, under MORI's calculations. *See* Ex. 1 to Pl.'s Cancel'n Br. at 1. These figures are a far cry from the numbers the government relied upon, which showed government savings of $1,225,325.81 using GS-13 step one salaries; $1,063,399.54 using GS-13 step five salaries; and $860,988.21 using GS-13 step ten salaries. AR at 6 (Spreadsheet).

Plaintiff's calculations do not, of course, represent the *only* reasonable manner in which an agency could compare costs for purposes of determining whether to cancel a solicitation. Perhaps the costs proposed by other offerors could be considered,[55] and departures from the Circular's methodology could be justified. But it is not rational for calculations purporting to rest on *plaintiff's* costs to ignore the rates plaintiff actually proposed for performing the requirements of the IT Services Solicitation. And while it is conceivable that an agency could have a rational reason for spending an additional $75,000 to insource certain work, no such reason is presented on this record. What we do know, however, is that the projection of "significant savings" of at least $860,988.21, upon which the agency based its decision, AR at 3-5, was arbitrarily calculated and is likely to be much less, if any at all.

This case is perhaps *sui generis* --- with the agency having relied on the analysis of an official under the cloud of alleged PIA violations, having ignored the requirements of the cancelled solicitation, and having no support in the record for its conclusions concerning available government personnel. But as far as the issue of the cost calculations is concerned, the Court finds that the case resembles *Wetsel-Oviatt Lumber Co. v. United States*, 43 Fed. Cl. 748 (1999), in which the court found a cancellation decision to be arbitrary and lacking a rational basis when "[e]rroneous data infected analysis" that was relied upon. *Id.* at 751 (quoting *Wetsel-Oviatt Lumber Co. v. United States*, 40 Fed. Cl. 557, 570 (1998)). Here, the contracting officer knew (or should have known) that Mr. Karimian's analysis was not based on MORI's proposed prices, *see* AR at 10, and could not help but notice that the analysis was based on far fewer than

ten positions, under MORI's calculations. *See* Ex. 1 to Pl.'s Cancel'n Reply at 1.

[55] The costs proposed by ATC are alleged to be significantly higher than MORI's. *See* Compl. ¶ 37(c).

the thirty-three positions required by the IT Services Solicitation (even if Help Desk positions are subtracted). The arbitrary analysis in the cost calculation spreadsheet cannot provide a rational basis for cancelling the IT Services Solicitation in its entirety.[56]

For the reasons stated above, the Court concludes that the agency lacked a rational basis for its decision to cancel the IT Services Solicitation. Accordingly, plaintiff's motion for judgment on the administrative record is GRANTED and defendant's cross-motion for judgment on the administrative record is DENIED.[57]

## D.  Is Injunctive Relief Appropriate?

By prevailing on the merits, MORI has satisfied one of the essential factors considered in determining whether a permanent injunction should issue. *See PGBA*, 389 F.3d at 1228-29. Concerning a second factor, proof of irreparable injury, plaintiff maintains that its loss of the opportunity to compete for the work under the IT Services Solicitation, and loss of the profits it would have earned had it been successful in the competition, constitute sufficient irreparable injury to support an injunction. *See* Pl.'s Cancel'n Br. at 37-39. MORI cites more than ten opinions of our court recognizing that the lost potential profits of bid protesters cannot be recovered in an action at law and thus, by their very nature, constitute irreparable injury. *See* Pl.'s Cancel'n Reply at 22-23 (citing *Great Lakes Dredge & Dock Co. v. United States*, 60 Fed. Cl. 350, 369-70 (Fed. Cl. 2004) and *Vanguard Sec. Inc. v. United States*, 20 Cl. Ct. 90, 112 (1990)); Pl.'s Cancel'n Br. at 38 & n.13 (citing *inter alia*, *Hospital Klean of Tex., Inc. v. United States*, 65 Fed. Cl. 618, 624 (2005) and *Cardinal Maint. Serv., Inc. v. United States*, 63 Fed. Cl. 98, 110 (2004)). The government contends that "[e]conomic harm alone, however, is not sufficient to establish irreparable injury," citing an opinion of our court in which the protester was not precluded from competing under a solicitation. *See* Def.'s Cancel'n Br. at 25 (citing *Minor Metals, Inc. v. United States*, 38 Fed. Cl. 379, 382 (1997). The government's other authority for this proposition is an opinion in a case in which the protester was alleging other sorts of financial harms, but not lost profits. *See Sierra Military Health Servs., Inc. v. United States*, 58 Fed. Cl. 573, 582 (2003) (distinguishing cases involving lost profits because "[i]n this case, [plaintiff] will not lose business and profit on the T-Nex contract" and "will still have the opportunity to obtain the contract").[58]

---

[56]  Had the analysis been adequately explained and properly calculated, it could have at least supported a decision to amend the solicitation to remove the positions that could be more cost effectively performed by government employees.

[57]  Since the Court has concluded that plaintiff has proven the cancellation decision to be arbitrary, under Count VII of the Complaint, it is not necessary to decide MORI's claim under Count VI, that the cancellation decision was made in bad faith.

[58]  *Sierra Military* is relied upon by defendant for its quotation from another authority, *OAO Corp. v. United States*, 49 Fed. Cl. 478 (2001), which included lost profits among a list of

Defendant attempts to distinguish MORI's authorities as involving protests where plaintiffs were denied level playing fields, not ones in which a procurement is cancelled.  Def.'s Cancel'n Br. at 25-26.  The Court does not find this distinction to be persuasive, as profits lost due to an arbitrary cancellation are no more recoverable than those lost due to an arbitrary award.  Moreover, our court has found that lost profits due to an arbitrary solicitation cancellation constitute irreparable injury.  *See Wetsel-Oviatt*, 43 Fed. Cl. at 753.  The government also unconvincingly cites two relatively recent Supreme Court opinions which it argues have "called into question" our opinions finding lost profits irreparable.  Def.'s Cancel'n Br. at 26.  One opinion merely stands for the proposition that the four-factor test --- which our court applies in bid protest cases --- cannot be displaced by a general rule automatically granting injunctions for certain violations.  *See eBay, Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 392-93 (2006).  But to recognize that meritorious bid protests that involve lost profits will satisfy the irreparable harm factor is not the same as automatically granting an injunction, as the other two factors must still be considered.  The other opinion similarly recognizes that a court may not presume that injunctions should issue in particular types of cases absent a reason not to issue them, but "rather, a court must determine that an injunction *should* issue under the traditional four-factor test." *Monsanto Co. v. Geertson Seed Farms*, 130 S. Ct. 2743, 2757 (2010).  But the Court is not aware of any opinions of our court which advocate scrapping the four-factor test when an arbitrary procurement action may have the consequence of depriving a bid protester of potential profits.  Certainly, this is not one.

The Court concludes it is well-established that the potential profits that are lost to offerors when arbitrary procurement actions would deprive them of the opportunity to compete for a contract will normally be sufficient to constitute irreparable injury.[59]  In this case, plaintiff has performed the incumbent contract containing many of the services required by the IT Services Solicitation, and was one of three small businesses submitting final proposal revisions.  *See* Compl. ¶¶ 43, 174.  Its irreparable injury due to the arbitrary cancellation has clearly been demonstrated.[60]  *See Overstreet Elec. Co. v. United States*, 47 Fed. Cl. 728, 744 (2000).

---

potential losses that it described, without supporting authority, as "not irreparable."  *See* Def.'s Cancel'n Br. at 25 (quoting *Sierra Military*, 58 Fed. Cl. at 582 (quoting *OAO Corp.*, 49 Fed. Cl. at 480)).

[59]  The Court leaves open the possibility that in a rare case, a proposed item or service may be so unique and irreproducible (and the demand for it sufficiently strong) that the loss of opportunity for one contract creates the availability for another generating comparable profits, diminishing the injury suffered by the offeror.

[60]  The government argues that the right to injunctive relief must be established by clear and convincing evidence.  *See* Def.'s Cancel'n Br. at 16.  The Court disagrees, and finds persuasive the analysis in *Textron, Inc. v. United States*, 74 Fed. Cl. 277, 287 (2006), and *Bannum, Inc. v. United States*, 60 Fed. Cl. 718, 723-24 (2004), *aff'd* 404 F.3d 1346 (Fed. Cir. 2005).  No binding

The third factor to be considered is whether the potential harm to the plaintiff in the absence of an injunction outweighs the potential harm to the government and third parties if the injunction is granted. *See FMC Corp.*, 3 F.3d at 427. Defendant argues that if the cancellation is enjoined, the agency will "be forced to procure services that the agency does not need," harming both it and taxpayers. Def.'s Cancel'n Reply at 13; Def.'s Cancel'n Br. at 29. But the administrative record shows that the decision to cancel was an arbitrary one. The Court cannot presume that the agency has adequate staff to perform all of the non-Help Desk work under the IT Services Solicitation, or that by using government employees the agency will spend less than it would if a contract is awarded under the procurement. Thus, the agency might in fact need the work to be performed by a contractor, and the taxpayers would prefer that option to a more costly insourcing. Until the agency considers the relevant information, employs rational factors in its calculations, and ceases relying on officials who might have an interest in seeing the procurement go away, neither the government nor the Court is in a position to determine whether or not the injunction, in fact, ends up benefiting the agency and the taxpayers. The harms posited by defendant are mere speculation, and are outweighed by the harm to MORI.

The final factor is whether an injunction serves the public interest. The government argues that an injunction would amount to an "'excessive judicial infringement upon the agency's discretion.'" Def.'s Cancel'n Br. at 28-29 (quoting *Aero Corp. v. United States*, 38 Fed. Cl. 237, 242 (1997) (citation omitted)). But this discretion may not be exercised to cancel a solicitation in an arbitrary manner. The public interest is better served if offerors are given the fair treatment required by 48 C.F.R. § 1.602-2(b), than if agencies may cancel solicitations without rationally considering the relevant factors and without reasonably determining whether savings would result. And since by all accounts the IT services needed by the agency are currently being provided by some combination of contractor staff and government employees, *see* Tr. (July 27, 2011) at 114-15, an injunction will not deprive the agency of any services. The Court concludes that all four factors have been satisfied by MORI, and its motion for a permanent injunction is accordingly GRANTED.

## E.  Should the Agency be Enjoined from Proceeding under the Help Desk Solicitation?

Plaintiff moves for a preliminary injunction to prevent the agency from using the Help Desk Solicitation as a vehicle for obtaining IT services. *See* Pl.'s Help Desk Br. at 15-17, 31-35. MORI argues that the agency acted arbitrarily by failing to consider whether the FAR's Rule of Two, 48 C.F.R. § 19.502-2(b), required the work in the Help Desk Solicitation to be set aside for award to a small business, and contends that the agency clearly violated the Rule of Two by not

---

precedents require an elevated burden of proof, and our court's opinions that utilize the clear and convincing standard trace back to a misreading of Tenth Circuit precedent. *See Bannum*, 60 Fed. Cl. at 723 (discussing *Baird Corp. v. United States*, 1 Cl. Ct. 662, 664 (1983) and *Goldammer v. Fay*, 326 F.2d 268, 270 (10th Cir. 1964)). It is clear from a review of the relevant precedents that the preponderance of the evidence test should apply. *See Career Training Concepts, Inc. v. United States*, 83 Fed. Cl. 215, 218-19 (2008).

setting this work aside.  Pl.'s Help Desk Br. at 17, 24.  It also argues that the agency acted in bad faith, using the Help Desk Solicitation as a pretext to avoid awarding it a contract.  *Id*.

The Rule of Two in 48 C.F.R. § 19.502-2(b) requires the contracting officer to "set aside any acquisition over $150,000 for small business participation when there is a reasonable expectation" of obtaining offers from at least two responsible small businesses at fair market prices.  48 C.F.R. § 19.502-2(b).  There seems to be no dispute that the costs of providing a Help Desk Manager and ten Help Desk Support Specialists, *see* App. to Def.'s Help Desk Br. at 8, will exceed $150,000.  Plaintiff alleges that three small businesses, including itself and ATC, were competing to provide the agency's required Help Desk services as part of the IT Services Solicitation.  Compl. ¶ 174.  This, too, does not appear to be in dispute.  Nor does the government argue that the agency had made the determination that the small businesses competing for a contract under the IT Services Solicitation could not provide the Help Desk services at fair market prices.  On this point, evidence in the administrative record of the IT Services Solicitation cancellation shows that MORI had proposed to perform the Help Desk work at discounted rates relative to its GSA FSS contract prices.  *See* AR at 80, 85.

The government's opposition to plaintiff's motion did not argue that the Help Desk work was unsuitable for a small business set-aside.  Instead, it first maintained that the agency's choice of an ID/IQ contract vehicle that uses task orders placed enforcement of the Rule of Two beyond the jurisdiction of courts, *see* Def.'s Help Desk Br. at 7-10, which has been addressed and rejected in part II.B.2 of this opinion.  On the merits of MORI's claim, other than disputing the bad faith allegations, *see id.* at 18-19, the government's only argument is that MORI waived its right to challenge the agency's failure to follow the Rule of Two by not challenging the terms of the NITAAC CIO-SP2i solicitation eleven years earlier, *see id*. at 10-14, 17 --- an argument which the Court has also rejected in part II.B.2 of this opinion.  Since it appears that the Help Desk Solicitation involved an acquisition exceeding $150,000 in value; that the solicitation sought services that three small businesses were competing to provide under another contract vehicle; that these services are currently provided by MORI, which is a small business; and that at least one small business (MORI) was offering to provide these services at a discount from its GSA FSS contract rates, the Court concludes it is likely that, under the Rule of Two, the acquisition must be set aside for a small business award.  *See* 48 C.F.R. § 19.502-2(b).  Plaintiff has shown a reasonable likelihood of success on the merits of its claim, satisfying one preliminary injunction factor.  *See FMC Corp.*, 3 F.3d at 427.[61]

Concerning the other three factors for injunctive relief, the government reprises the arguments it raised in the context of the cancellation decision.  *See* Def.'s Help Desk Br. at 20-24.  As was explained above, MORI's loss of the opportunity to compete for the provision of the Help Desk services, and its corresponding loss of potential profits, constitute irreparable injury for purposes of injunctive relief.  The harm to the agency against which this injury must be balanced has been identified by the government as "excessive judicial infringement upon the

---

[61]  Again, the Court finds it unnecessary to consider MORI's allegations of bad faith or pretext.

agency's discretion."  *Id.* at 23-24 (quoting *Aero Corp.*, 38 Fed. Cl. at 242 (citation omitted)).
But the agency has no discretion to ignore the requirements of 48 C.F.R. § 19.502-2(b).  No harm
to third parties is involved, as no task order has issued.  Clearly, the balance of hardships favors
plaintiff.  And finally, the public interest is served by enforcing the policy choice of Congress,
implemented in the FAR, to have small business participation in certain acquisitions.
Accordingly, MORI has demonstrated that all four factors point in its favor, and it is entitled to a
preliminary injunction preventing the agency's use of the Help Desk Solicitation.  The agency
cannot use such a vehicle, precluding any small business participation, without first determining
under the Rule of Two whether the acquisition should be set aside.  It is highly likely that the
application of the Rule of Two will show that the acquisition of Help Desk services should,
indeed, be set aside for a small business award.  Plaintiff's motion for a preliminary injunction is
GRANTED.

The Court must also determine the proper amount of security that the plaintiff must give
under RCFC 65(c).  No task order has issued or been proposed, so no private contractor is in a
position to suffer costs or damages from this injunction, nor will the government face termination
for convenience costs.  Accordingly, the proper amount of security in this case is $0.00.

## III.  CONCLUSION

The National Institutes of Health, and National Institute of Diabetes and Digestive and
Kidney Diseases, acted arbitrarily and capriciously in cancelling solicitation NIH-NIDDK-08-01,
to the prejudice of MORI Associates, Inc.  Plaintiff's motion for judgment on the administrative
record is **GRANTED** as to Count VII of its Second Amended Second Supplemental Complaint,
and defendant's motion to dismiss Count VII and cross-motion for judgment on the
administrative record are **DENIED**.  Plaintiff has proven its entitlement to a permanent
injunction rescinding the November 29, 2010 cancellation of solicitation NIH-NIDDK-08-01.
Plaintiff has also proven its entitlement to a preliminary injunction preventing NIH and NIDDK
from proceeding with an acquisition under RFQ No. NLM-11-105/KDM, as it is highly likely
that the services sought should be set aside for a small business award under 48 C.F.R. § 19.502-
2(b).  MORI's motion for a preliminary injunction concerning that acquisition is **GRANTED**.

Accordingly, **IT IS ORDERED** that the United States, including the Department of
Health and Human Services, the NIH, the NIDDK, its Contracting Officer, and its other officers,
agents, servants, employees, and representatives, and all persons acting in concert and
participating with them respecting the procurement under solicitation NIH-NIDDK-08-01 are
hereby RESTRAINED AND ENJOINED from cancelling solicitation NIH-NIDDK-08-01 based
on the November 29, 2010 cancellation and the November 23, 2010 memorandum of the
Contracting Officer.

Pending further order of the Court, **IT IS ORDERED** that the United States, including
the Department of Health and Human Services, the NIH, the NIDDK, its Contracting Officer,
and its other officers, agents, servants, employees, and representatives, and all persons acting in

concert and participating with them respecting the procurement under RFQ No. NLM-11-105/KDM are hereby RESTRAINED AND ENJOINED from awarding a task order under RFQ No. NLM-11-105/KDM or allowing any contractor to perform under any task order under RFQ No. NLM-11-105/KDM.

Under Rule 65(c) of the Rules of the Court of Federal Claims, the plaintiff must give security "in an amount that the court considers proper."  The Court has determined that the proper amount of security in this case is $0.00.

The parties shall file a joint status report within ten days of the date of this Opinion and Order proposing a schedule for further proceedings.

**IT IS SO ORDERED.**

s/ Victor J. Wolski
**VICTOR J. WOLSKI**
Judge